STATE OF MINNESOTA

IN SUPREME COURT

A14-0771

Court of Appeals

Dietzen, J.
Dissenting, Gildea, C.J.
Dissenting, Page, J.

State of Minnesota,

Respondent,

Filed: August 19, 2015
Office of Appellate Courts

vs.

Derek Lawrence Stavish,

Appellant.

_____

Lori Swanson, Attorney General, Saint Paul, Minnesota; and

Michelle M. Zehnder Fischer, Nicollet County Attorney, James P. Dunn, Chief Deputy County Attorney, Saint Peter, Minnesota, for respondent.

James M. Ventura, James M. Ventura Attorney at Law, Wayzata, Minnesota;

Michael S. Gaarder, Pennington & Cherne PLLC, St. Cloud, Minnesota; and

John J. Neal, Willenbring, Dahl, Wocken & Zimmermann PLLC, Cold Spring, Minnesota, for appellant.

_____

1

S Y L L A B U S

1.    The State established that it cannot prove an essential element of two counts of the complaint if the alcohol concentration evidence is suppressed, and therefore satisfied the critical impact requirement to appeal the pretrial order.

2.    Based upon the totality of the circumstances, the State established that law enforcement was faced with an emergency in which the delay necessary to obtain a warrant made a warrantless blood draw reasonable under the exigency exception to the Fourth Amendment.

Affirmed.

O P I N I O N

DIETZEN, Justice.

Appellant Derek Stavish was charged with three counts of criminal vehicular operation resulting in death, two counts of fourth-degree driving while impaired, reckless driving, and careless driving arising out of a single-vehicle rollover crash on June 18, 2012, that resulted in the death of Brent Lehnen and serious injuries to Stavish. Stavish moved to suppress alcohol concentration test results from a blood draw taken after the accident on the grounds that his blood was drawn without a warrant and without his consent. The district court granted the motion to suppress concluding, in part, that the State failed to satisfy the exigent circumstances exception as applied in *Missouri v. McNeely*, ___ U.S. ___, 133 S. Ct. 1552 (2013). The court of appeals reversed, concluding that the State established exigent circumstances that justified the warrantless search. *State v. Stavish*, 852 N.W.2d 906, 909 (Minn. App. 2014). Because we agree

2

that the State established that exigent circumstances justified the warrantless blood draw in this case, we affirm.

On the evening of June 18, 2012, the Minnesota State Patrol responded to a 911 call regarding a vehicle crash in rural Nicollet County. Based upon an investigation at the scene, officers determined that the accident resulted in one fatality, that the alleged driver, appellant Derek Stavish, was seriously injured, and that alcohol may have been a factor in the accident. An officer obtained a blood draw from Stavish and later testing of that blood revealed an alcohol concentration of 0.20.

The State filed seven criminal charges against Stavish: (1) criminal vehicular operation resulting in death, in violation of Minn. Stat. § 609.21, subd. 1(1) (2012) (operating a motor vehicle in a grossly negligent manner); (2) criminal vehicular operation resulting in death, in violation of Minn. Stat. § 609.21, subd. (1)(2)(i) (operating a motor vehicle in a negligent manner while under the influence of alcohol); (3) criminal vehicular operation resulting in death, in violation of Minn. Stat. § 609.21, subd. 1(3) (operating a motor vehicle while having an alcohol concentration of 0.08 or more); (4) fourth-degree driving while impaired (DWI), in violation of Minn. Stat. § 169A.20, subd. 1(1) (2014) (driving while under the influence of alcohol); (5) fourth-degree DWI, in violation of section 169A.20, subd. 1(5) (driving with an alcohol concentration of 0.08 or more, as measured within 2 hours of driving); (6) reckless driving, in violation of Minn. Stat. § 169.13, subd. 1 (2014); and (7) careless driving, in violation of Minn. Stat. § 169.13, subd. 2 (2014).

Stavish brought a motion to suppress the alcohol concentration test results. The parties acknowledged that when Stavish's blood was drawn, our decision in *State v. Shriner*, 751 N.W.2d 538, 548-50 (Minn. 2008), *abrogated by Missouri v. McNeely*, ___ U.S. ___, 133 S. Ct. 1552 (2013), permitted a warrantless, nonconsensual blood draw from a defendant, provided that the officer had probable cause to believe the defendant had committed criminal vehicular homicide or operation. But the parties also acknowledged that the United States Supreme Court's decision in *McNeely*, ___ U.S. ___, 133 S. Ct. 1552, which abrogated *Shriner*, was released prior to the omnibus hearing and was applicable to this case. Stavish argued that the blood draw constituted a warrantless, nonconsensual search taken in violation of his constitutional rights. The State countered that the exigencies of the situation justified a warrantless search under *McNeely*, ___ U.S. at ___, 133 S. Ct. at 1561.

After a contested omnibus hearing, the district court set forth the operative facts in two pretrial orders. Law enforcement received a report of a crash at 10:28 p.m. Sergeant Martens testified that the first officers to arrive at the accident scene observed that there had been a single-vehicle rollover crash involving a pickup truck. When Sergeant Martens arrived at the crash site around 10:45 p.m., he was informed that two people had been ejected from the vehicle and that one person had died. The other person ejected, later identified as Stavish, sustained serious injuries, was transported by ambulance to New Ulm Medical Center (NUMC), and would possibly be transported by helicopter from NUMC to a medical trauma center. Before he was transported to NUMC, Stavish admitted to one of the officers that he was the driver of the vehicle.

4

The officers at the accident scene decided that Sergeant Martens would go to the hospital to determine the involvement of alcohol in the crash. Upon arrival at the NUMC emergency room, Sergeant Martens spoke to Stavish, who was being tended by multiple medical personnel. Stavish smelled strongly of alcohol, and admitted to Sergeant Martens that he had been drinking prior to the crash. Sergeant Martens advised an emergency room nurse that he needed a blood draw from Stavish, and a sample was drawn at 11:18 p.m. Testing of the blood sample revealed an alcohol concentration of 0.20.

Sergeant Martens testified that he believed he had the authority to obtain the blood sample under Minnesota law, and therefore did not secure a warrant or obtain Stavish's consent. Sergeant Martens admitted that, at the time Stavish's blood was drawn, 70 minutes remained in the 2-hour window for obtaining a blood sample. Sergeant Martens did not ask hospital personnel whether Stavish would be airlifted to another medical center, and did not attempt to contact the on-call judge or prosecutor to obtain a telephonic warrant.

In a September 2013 pretrial order, the district court denied Stavish's motion to suppress the alcohol concentration test results. The court concluded the State failed to prove exigent circumstances justifying a warrantless blood draw, but that the alcohol concentration test results were admissible under the good-faith exception to the exclusionary rule because, at the time the blood draw was taken, such a search was deemed constitutional. *See Shriner*, 751 N.W.2d at 549-50.

5

Stavish filed a motion for the district court to reconsider its decision. The district court, relying upon *State v. Brooks*, 838 N.W.2d 563 (Minn. 2013), *cert. denied*, 134 S. Ct. 1799 (2014), filed a second pretrial order in May 2014 that granted Stavish's motion to reconsider and suppressed the alcohol concentration test results on the ground that this court declined to resolve *Brooks* on the basis of a good-faith exception to the exclusionary rule. The court denied the State's motion to reconsider the exigency determination. The State appealed the second pretrial order.

The court of appeals reversed the district court's order suppressing the alcohol concentration test results, concluding that the exigencies of the situation justified a warrantless blood draw, and that the blood draw was therefore constitutional. *State v. Stavish*, 852 N.W.2d 906, 909 (Minn. App. 2014). The court of appeals did not reach the good-faith exception issue. We granted review.

I.

Because this is a State's pretrial appeal, we first must determine whether the suppression of the alcohol concentration test results will have a critical impact on the State's case. A pretrial order may be appealed only when the State shows "the district court's alleged error, unless reversed, will have a critical impact on the outcome of the trial." Minn. R. Crim. P. 28.04, subd. 2(b). When a pretrial order suppresses evidence in a criminal prosecution, the State must show that excluding the evidence "significantly reduces the likelihood of a successful prosecution." *State v. Zais*, 805 N.W.2d 32, 36 (Minn. 2011) (citations omitted). Previously, we have held that critical impact is established if the exclusion of evidence would prevent the State from successfully

6

prosecuting one of the specific charges. *State v. Underdahl*, 767 N.W.2d 677, 684 (Minn. 2009) (holding that "an order that dismisses DWI charges, even when other charges remain, will have a critical impact on the prosecution's case"); *State v. Hicks*, 301 Minn. 350, 353, 222 N.W.2d 345, 347 (1974) (holding that a pretrial order suppressing the results of an alcohol concentration test was appealable by the State because the order prevented successful prosecution for the charged offense of driving with an alcohol concentration of 0.10 or greater, even though other charges were not affected).

We conclude the State has established that it cannot prove an essential element of two of the charged counts if the alcohol concentration evidence is suppressed. Specifically, the count charging Stavish with criminal vehicular homicide, in violation of Minn. Stat. § 609.21, subd. 1(3), and the count charging Stavish with fourth-degree DWI, in violation of Minn. Stat. § 169A.20, subd. 1(5), require the State to establish that Stavish's alcohol concentration was at or exceeded 0.08. Because two of the charges in this case will be dismissed if the alcohol concentration evidence is suppressed, the State has established critical impact in this case.

II.

We next address whether Stavish's warrantless blood draw violated his Fourth Amendment rights. The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

7

U.S. Const. amend. XIV. It is well-settled that a blood draw is a search that is subject to Fourth Amendment protections. *McNeely*, ___ U.S. at ___, 133 S. Ct. at 1558.

The Fourth Amendment expressly requires (1) that a search and seizure be reasonable, and (2) that "a warrant may not be issued unless probable cause is properly established and the scope of the authorized search is set out with particularity." *Kentucky v. King*, ___ U.S. ___, ___, 131 S. Ct. 1849, 1856 (2011). A warrantless search or seizure is presumptively unreasonable. *See, e.g.*, *id.* (referring to the search of a home); *McNeely*, ___ U.S. at ___, 133 S. Ct. at 1558 (referring to the search of the person). The presumption, however, may be overcome in some circumstances because "the ultimate touchstone of the Fourth Amendment is reasonableness." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (citations omitted).

A warrantless search of a person is reasonable only if it falls within a recognized exception to the warrant requirement. *McNeely*, ___ U.S. at ___, 133 S. Ct. at 1558. One well-recognized exception to the warrant requirement applies when "the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Mincey v. Arizona*, 437 U.S. 385, 394 (1978) (citations omitted). Exigent circumstances justifying a warrantless search may exist when "there is compelling need for official action and no time to secure a warrant." *Michigan v. Tyler*, 436 U.S. 499, 509 (1978).

The United States Supreme Court has recognized several circumstances that may give rise to an exigency that justifies a warrantless search, including preventing the

imminent destruction of evidence. *King*, ___ U.S. at ___, 131 S. Ct. at 1856-57. To resolve whether a law enforcement officer faced an emergency that justified acting without a warrant, the Court applies the totality-of-the-circumstances approach. *See McNeely*, ___ U.S. at ___, 133 S. Ct. at 1559. The exigent circumstances analysis requires an objective evaluation of the facts reasonably available to the officer at the time of the search. *See Brigham City*, 547 U.S. at 404.

## A.

The United States Supreme Court has considered whether exigent circumstances existed to justify a warrantless blood draw of a suspected drunk driver in two relevant cases. *McNeely*, ___ U.S. ___, 133 S. Ct. 1552; *Schmerber v. California*, 384 U.S. 757 (1966). In *Schmerber*, the defendant was arrested at a hospital on suspicion of driving under the influence while he was receiving treatment for injuries suffered in an accident in which he had been the driver. *Id.* at 758. The officer ordered a blood sample taken without a warrant and over the defendant's objection. *Id.* at 768-69.

The Court held that the exigencies of the situation made the warrantless blood draw reasonable, and therefore that the defendant's Fourth Amendment rights were not violated. *Id.* at 771. It reasoned that "special facts" rendered it appropriate for the police to act without a warrant. *Id.* Those special facts were that the evidence could have been lost because "the percentage of alcohol in the blood begins to diminish shortly after drinking stops, as the body functions to eliminate it from the system." *Id.* at 770. Moreover, the time necessary to bring the defendant to the hospital and investigate the scene of the accident resulted in there being no time to seek out a magistrate and secure a

9

warrant. *Id.* at 770-71. Given these "special facts," the officer "might reasonably have believed that he was confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threatened the destruction of evidence." *Id.* at 770.

In *Missouri v. McNeely*, the Supreme Court granted certiorari to resolve a split of authority regarding whether "the natural metabolization of alcohol in the bloodstream presents a *per se* exigency that justifies an exception to the Fourth Amendment's warrant requirement for nonconsensual blood testing in all drunk-driving cases." ___ U.S. at ___, 133 S. Ct. at 1556. The case involved a DWI investigation, in which McNeely was stopped by a Missouri police officer for speeding and suspected of DWI. *Id.* The officer, who observed several indicia that McNeely was intoxicated, requested that McNeely provide a breath sample. *Id.* When McNeely failed to provide a breath sample, the officer had a blood sample drawn at a hospital, which measured McNeely's alcohol concentration at 0.154. *Id.* at ___, 133 S. Ct. at 1556-57.

The Court concluded that the natural and gradual dissipation of alcohol in the defendant's bloodstream, in and of itself, does not constitute an exigency in every drunk-driving case sufficient to justify a warrantless blood draw. *Id.* at ___, 133 S. Ct. at 1563. Nevertheless, the Court recognized that in some circumstances law enforcement may conduct a warrantless blood draw to prevent the imminent destruction of alcohol concentration evidence. *Id.* at ___, 133 S. Ct. at 1561. But whether exigent circumstances exist must be decided in each case, based on the totality of the circumstances. *Id.*

10

In considering whether exigent circumstances are present, the Court in *McNeely* reaffirmed that "the metabolization of alcohol in the bloodstream and the ensuing loss of evidence are among the factors that must be considered in deciding whether a warrant is required." *Id.* at ___, 133 S. Ct. at 1568. "[B]ecause an individual's alcohol level gradually declines soon after he stops drinking, a significant delay in testing will negatively affect the probative value of the results." *Id.* at ___, 133 S. Ct. at 1561. The Court also acknowledged that even though experts can work backwards and use an alcohol concentration at the time a sample was taken to determine an alcohol concentration at the time of an alleged offense, long "intervals may raise questions about the accuracy of the calculations." *Id.* at ___, 133 S. Ct. at 1563. At the same time, the Court noted that advancements since *Schmerber* was decided allow for more expeditious processing of warrant applications. *Id.* at ___, 133 S. Ct. at 1561-63. Thus, if under the totality of the circumstances, law enforcement "can reasonably obtain a warrant before a blood sample can be drawn without significantly undermining the efficacy of the search, the Fourth Amendment mandates that they do so." *Id.* at ___, 133 S. Ct. at 1561.

In light of *McNeely* and *Schmerber*, the relevant inquiry is whether, under all of the facts reasonably available to the officer at the time of the search, it was objectively reasonable for the officer to conclude that he or she was faced with an emergency, in which the delay necessary to obtain a warrant would significantly undermine the efficacy

11

of the search.[1] *McNeely*, ___ U.S. at ___, 133 S. Ct. at 1561 (stating that the Fourth Amendment mandates that an officer obtain a warrant before a blood draw unless doing so would "significantly undermin[e] the efficacy of the search"); *Schmerber*, 384 U.S. at 770 ("The officer in the present case, however, might reasonably have believed that he was confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threatened the destruction of evidence.")

### B.

With this framework in mind, we turn to the question of whether the State established that exigent circumstances justified the warrantless blood draw. *See State v. Ture*, 632 N.W.2d 621, 627 (Minn. 2001) ("The state bears the burden of establishing an exception to the warrant requirement."). We review the district court's factual findings under the clearly erroneous standard. *State v. Zornes*, 831 N.W.2d 609, 621 (Minn. 2013). But we review the district court's legal conclusions de novo. *Id.* Thus, we review the court's ultimate determination of exigency de novo. *See In re Welfare of*

---

[1]     In addition to the existence of exigent circumstances, there must be probable cause to believe the defendant committed a crime in order for a nonconsensual, warrantless blood draw to be constitutional. *See State v. Aguirre*, 295 N.W.2d 79, 81-82 (Minn. 1980) (stating that "the constitutional prerequisite to the warrantless nonconsensual removal of blood of a conscious or unconscious driver" is "probable cause plus exigent circumstances"); *see also State v. Lee*, 585 N.W.2d 378, 381 (Minn. 1998) (stating that the probable cause that is required for purposes of a warrantless, nonconsensual blood draw is probable cause to believe the defendant has committed a crime and "probable cause to believe that . . . administration of the [blood alcohol] test will result in the discovery of evidence that will aid in the prosecution of that crime" (quoting *State v. Speak*, 339 N.W.2d 741, 745 (Minn. 1983))). Stavish, however, does not argue that the State lacked probable cause to conclude that he committed criminal vehicular operation or DWI, or that the administration of a blood alcohol test would not result in the discovery of evidence relevant to the prosecution of a crime.

*D.A.G.*, 484 N.W.2d 787, 791 (Minn. 1992) ("[W]e make our own evaluation of the found facts in determining whether exigent circumstances exist.").

The relevant circumstances in this case are that officers from the State Patrol responded to a report of a single-vehicle accident involving a fatality and injuries to Stavish, who was ejected from his vehicle. Upon his arrival at the accident scene, Sergeant Martens learned from other officers that Stavish had admitted to being the driver, had sustained serious injuries, had been transported by ambulance to a nearby hospital, and would possibly be airlifted to a different hospital. Sergeant Martens then drove to the hospital to talk with Stavish and determine the involvement of alcohol in the accident. When he spoke with Stavish in the emergency room, Sergeant Martens detected the strong odor of alcohol. The record also indicates that Sergeant Martens observed multiple medical personnel tending to Stavish in the emergency room.

We conclude that the State established under the totality-of-the-circumstances approach that exigent circumstances justified the warrantless blood draw. The relevant circumstances are that law enforcement had reason to believe that Stavish, who allegedly admitted to being the driver, had consumed alcohol, and that alcohol contributed to the accident. Thus, it was important to draw Stavish's blood within 2 hours of the accident to ensure the reliability and admissibility of the alcohol concentration evidence.[2] *See* Minn.

---

[2] Stavish was charged with, among other things, the offense of driving while impaired under Minn. Stat. § 169A.20, subd. 1(5), which defines impairment as an alcohol concentration of 0.08 or greater measured within 2 hours of the time of driving. Although alcohol concentration testing of a blood sample obtained more than 2 hours after driving may still be admissible to prove impairment, *see* Minn. Stat. § 169A.45,

(Footnoted continued on next page.)

Stat. § 169A.20, subd. 1(5) (defining impairment as an alcohol concentration of 0.08 or greater, as measured within 2 hours of the time of driving). Additionally, Stavish sustained serious injuries that necessitated emergency medical treatment at a hospital and potentially required that he be transported by helicopter to another hospital. Stavish's medical condition and need for treatment rendered his future availability for a blood draw uncertain. Sergeant Martens did not know how long Stavish was likely to remain at the same hospital or whether further medical care would preclude obtaining a sample even if Stavish stayed at the same hospital. Consequently, it was objectively reasonable for Sergeant Martens to conclude that he was faced with an emergency in which the delay

---

(Footnote continued from previous page.)
subd. 4 (2014), the 2-hour window is relevant to the exigency analysis because collecting a blood sample within that window best ensures that the sample can be used to prove impairment. *Cf. McNeely*, ___ U.S. at ___, 133 S. Ct. at 1563 ("While experts can work backwards from the [blood alcohol concentration] at the time the sample was taken to determine [blood alcohol concentration] at the time of the alleged offense, longer intervals may raise questions about the accuracy of the calculation.").

Stavish argues that Minn. Stat. § 169A.20, subd. 1(5), is unconstitutional as a legislative attempt to create a statutory exigency that circumvents constitutional protections. This argument lacks merit. Under section 169A.20, subdivision 1(5), measurement of an alcohol concentration of 0.08 or higher within 2 hours of driving is an element of the offense of driving while impaired. *McNeely* does not prohibit a State from criminalizing such conduct. *See generally McNeely*, ___ U.S. ___, 133 S. Ct. 1552; *cf. State v. Olson*, 325 N.W.2d 13, 17-18 (Minn. 1982) ("The power to define the conduct which constitutes a criminal offense . . . is vested in the legislature."). Moreover, section 169A.20, subdivision 1(5), does not authorize a blood draw without a warrant or purport to establish the natural dissipation of alcohol as a single-factor exigency, in circumvention of *McNeely*. It also does not eliminate the State's burden to prove that, because of the circumstances present in a particular case, a warrant could not have been reasonably obtained before a blood draw without significantly undermining the efficacy of the search. Thus, section 169A.20, subdivision 1(5), is not unconstitutional.

14

necessary to obtain a warrant threatened the destruction of evidence.[3] *See Schmerber*, 384 U.S. at 770.

Stavish argues, and the district court concluded, that Sergeant Martens' failure to ask the treating physician or other hospital personnel if Stavish would, in fact, be airlifted to another medical center undermines the State's argument that Sergeant Martens was faced with an emergency. The district court reasoned that such an inquiry would "have been simple enough to [make], and it would have provided the trooper with a definite answer." We disagree for two reasons.

First, existing federal and state privacy laws limit information that may be disclosed about a person's medical condition and treatment without the person's written

---

[3] Justice Page's dissent argues that we have drawn an analogy to *Schmerber* but ignored the factual differences between *Schmerber* and this case. We disagree. *Schmerber* applied a totality-of-the-circumstances approach to determine whether exigent circumstances existed in a given case. *See* 384 U.S. at 770-71. Justice Page correctly points out *Schmerber* is factually distinguishable because Sergeant Martens was not required to investigate the scene of the accident and, unlike in *Schmerber*, the time necessary to transport the accused to the hospital was not a significant factor. *See id.* at 769-71. The dissent, however, ignores the medical emergency present in this case that was not present in *Schmerber*. While both Schmerber and Stavish were injured in car accidents and taken to a hospital for treatment, Stavish was ejected from his vehicle and sustained serious injuries that required emergency medical treatment at the hospital and may have required air transport to another hospital. We observe that if an accident resulting in the death of one individual and serious injury to another requiring continuous and advanced medical treatment does not qualify for the exigency exception, it is difficult to imagine circumstances that would so qualify. Both *Schmerber* and *McNeely* require that the court examine *all* relevant facts under the totality of the circumstances. *See McNeely*, ___ U.S. at ___, 133 S. Ct. at 1560 ("In finding the warrantless blood test reasonable in *Schmerber*, we considered all of the facts and circumstances of the particular case and carefully based our holding on those specific facts."); *id* at ___, 133 S. Ct. at 1563 ("Whether a warrantless blood test of a drunk-driving suspect is reasonable must be determined case by case based on the totality of the circumstances.").

15

consent.[4] The existing applicable law would likely have precluded Sergeant Martens from obtaining additional information regarding Stavish's medical condition and treatment from the treating physician or other hospital personnel without Stavish's written consent. Second, even if Sergeant Martens knew that Stavish was not going to be transported to another medical center, Sergeant Martens could still have reasonably concluded that he was faced with an emergency situation. Given the seriousness of Stavish's condition and the fact that Stavish's medical diagnosis and treatment was evolving, Sergeant Martens could not predict whether Stavish would continue to be available for a blood draw even if he was not transported to a different hospital. Therefore, Sergeant Martens' failure to verify whether Stavish would in fact be airlifted does not undercut the existence of exigent circumstances.

---

[4] The federal Health Insurance Portability and Accountability Act of 1996 (HIPAA) mandates regulations governing privacy standards for certain health care information. Pub. L. No. 104-191, 110 Stat. 1936 (1996) (codified primarily in Titles 26, 29, and 42 of the United States Code). The HIPAA regulations specify the circumstances under which health care providers and other "covered entit[ies]" may disclose "protected health information," which is broadly defined to include individually identifiable information that relates to a patient's past, present, or future medical condition or treatment and is received or transmitted by a health care provider. 45 C.F.R. § 160.103 (2014). HIPAA's privacy protections apply to electronic, written, and oral information. *E.g.*, *Holman v. Rasak*, 761 N.W.2d 391, 393 (Mich. Ct. App. 2008), *aff'd*, 785 N.W.2d 98, 101 (Mich. 2010); Office for Civil Rights, U.S. Dep't of Health & Human Serv'cs, *OCR Privacy Brief: Summary of the HIPAA Privacy Rule* at 3 (2003), http://www.hhs.gov/ocr/privacy/hipaa/understanding/summary/privacysummary.pdf. Without the written authorization of the individual, a health care provider or other covered entity is permitted to disclose protected health information to a law enforcement officer for law enforcement purposes only if one of six exceptions applies. *See* 45 C.F.R. § 164.512(f) (2013). None of these exceptions are implicated by the specific facts of this case. *See id.* The Minnesota Health Records Act provides similar privacy protections to patient health care information and does not contain a law enforcement exception that is applicable to the specific facts of this case. *See* Minn. Stat. §§ 144.291-144.34 (2014).

Stavish next argues, and Justice Page's dissent asserts, that the State failed to establish exigent circumstances because it did not prove that Sergeant Martens could not have obtained a telephonic warrant within 2 hours of the accident. *See* Minn. R. Crim. P. 36.01-.08 (authorizing search warrants on oral testimony). It is true that when Sergeant Martens obtained the blood sample from Stavish, there were 70 minutes left in the 2-hour window established by Minn. Stat. § 169A.20, subd. 1(5). Stavish's argument, however, fails to consider the totality of the circumstances. Although it is true that 70 minutes remained in the 2-hour window and that the State did not establish how long it likely would have taken to obtain a telephonic warrant, Stavish's medical condition and ongoing emergency medical treatment changed the nature of the analysis. Specifically, the seriousness and uncertainty of Stavish's medical condition, coupled with the possibility of transport to another hospital, made it impossible for Sergeant Martens to know how long Stavish would be available for a blood draw. Thus, Sergeant Martens was faced with an emergency situation in which it was reasonable to conclude that *any* delay necessary to obtain a warrant would "significantly undermin[e] the efficacy of the search."[5] *McNeely*, ___ U.S. at ___, 133 S. Ct. at 1561.

---

[5] That is not to say that the mere fact an impaired-driving suspect is injured and brought to the emergency room per se creates exigent circumstances. Instead, the State must establish that the facts reasonably available to the officer regarding the suspect's medical condition allowed the officer to reasonably conclude that there was not time to obtain a warrant before the blood draw without significantly undermining the efficacy of the search. In many cases, the State may need to present evidence about the length of time it takes to obtain a telephonic warrant in order to establish exigent circumstances. But even without such evidence in this case, exigent circumstances existed because the

(Footnoted continued on next page.)

17

## C.

Although we agree with the court of appeals' ultimate determination that the warrantless blood draw was justified by exigent circumstances, we conclude that the court of appeals erred in its underlying reasoning in two respects. First, the court of appeals relied upon the fact that law enforcement "was attempting to obtain evidence essential to a probable vehicular homicide charge, not merely a DWI charge." *Stavish*, 852 N.W.2d at 909. The seriousness of the offense does not itself create exigency, *Mincey*, 437 U.S. at 394, and does not reduce the quantum of evidence the State must present to prove exigent circumstances.

Second, the court of appeals relied upon the fact that the accident took place in one county while Stavish was taken to a hospital in a second county for treatment. *Stavish*, 852 N.W.2d at 908. The fact that the hospital is located in a different county than the accident site does not itself create exigent circumstances. Instead, the relevant consideration is whether the time necessary to bring the accused to the hospital, or for the officer to travel to the hospital, impacted the officer's ability to obtain a warrant before the blood draw without significantly undermining the efficacy of the search. In this case, the hospital was only a 10-15 minute drive from the crash site, and Stavish was already at the hospital when Sergeant Martens arrived. Therefore, the fact that the location of the

(Footnote continued from previous page.)
specific facts establish that *any* delay necessary to obtain a warrant would significantly undermine the efficacy of the search.

18

crash site and the hospital were in different counties was not by itself relevant to Sergeant Martens' ability to obtain a warrant before the blood draw.

III.

Because we conclude that the State proved the existence of exigent circumstances justifying the warrantless blood draw, we do not need to address the State's alternative argument that the good-faith exception to the exclusionary rule applies. *See Davis v. United States*, ___ U.S. ___, ___, 131 S. Ct. 2419, 2429 (2011) (holding that evidence obtained during a search conducted in objectively reasonable reliance on binding appellate precedent is not subject to the exclusionary rule).

Affirmed.

D I S S E N T

GILDEA, Chief Justice (dissenting).

I respectfully dissent and join Justice Page's dissent in part. I agree with Justice Page that the State did not meet its burden to prove exigency, and I join in sections I and II of Justice Page's dissent on the exigency issue except to the extent he discusses *State v. Bernard*, 859 N.W.2d 762 (Minn. 2014).

For the reasons set forth in my separate dissent in *State v. Lindquist*, ___ N.W.2d ___ (Minn. Aug. 19, 2015), I would not apply the good faith exception in this case.

D I S S E N T

PAGE, Justice (dissenting).

I respectfully dissent. In this case, the court continues its efforts, begun in *State v. Bernard*, 859 N.W.2d 762 (Minn. 2015), and reiterated in *State v. Lindquist*, ___ N.W.2d ___ (Minn. Aug. 19, 2015), to protect its erroneous decision in *State v. Shriner*, 751 N.W.2d 538 (Minn. 2008) (establishing that the evanescent nature of alcohol in the bloodstream is a single-factor exigency), *abrogated by Missouri v. McNeely*, ___ U.S. ___, 133 S. Ct. 1552 (2013) (holding that, contrary to this court's decisions in *Shriner*, the dissipation of alcohol in the blood does not create a per se exigency), and *Shriner's* progeny. In *Bernard*, we "fundamentally depart[ed] from longstanding Fourth Amendment principles" to justify a warrantless breath test as a valid search incident to arrest—"creating a novel bright-line rule" that "simply readopts a per se exigency under a different name." 859 N.W.2d at 774, 779 (Minn. 2015) (Page, J., & Stras, J., dissenting jointly). Here, the court doubles down and again "readopts a per se exigency," *id.* at 779, this time by refusing to hold the State to its "heavy burden" to rebut the presumption of unreasonableness associated with a warrantless search of the person, *Welsh v. Wisconsin*, 466 U.S. 740, 749-50 (1984), by establishing that "the delay necessary to obtain a warrant, under the circumstances, threatened 'the destruction of evidence,' " *Schmerber v. California*, 384 U.S. 757, 770 (1966) (citation omitted). The record upon which the court finds the existence of exigent circumstances is so minimal that the decision here, in effect, nullifies the warrant requirement in every suspected drunk-driving case involving

an accident with serious injuries—contradicting basic Fourth Amendment principles and the Supreme Court's decision in *McNeely*.

I.

The Fourth Amendment provides, in relevant part, that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause." A blood draw is a search of the person that is subject to Fourth Amendment protections. *Missouri v. McNeely*, ___ U.S. ___, ___, 133 S. Ct. 1552, 1558 (2013).

A warrantless search of a person is reasonable only if it falls within a recognized exception to the warrant requirement. *McNeely*, ___ U.S. at ___, 133 S. Ct. at 1558. One well-recognized exception to the warrant requirement applies when "the exigencies of the situation make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment." *Kentucky v. King*, ___ U.S. ___, ___, 131 S. Ct. 1849, 1856 (2011) (alteration in original) (citation omitted). To determine whether exigent circumstances justified a warrantless search, a court must engage in a totality-of-the-circumstances analysis. *McNeely*, ___ U.S. at ___, 133 S. Ct. at 1554. This analysis requires an objective evaluation of the facts reasonably available to the officer at the time of the search. *See Brigham City v. Stuart*, 547 U.S. 398, 404 (2006). The State bears a "heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests." *Welsh v. Wisconsin*, 466 U.S. 740, 749-50 (1984); *see also id.* at 750 (explaining that "the burden is on the government to

demonstrate exigent circumstances that overcome the presumption of unreasonableness that attaches" to a warrantless search).

The United States Supreme Court has considered whether exigent circumstances existed to justify a warrantless blood draw of a suspected drunk driver in two relevant cases. *McNeely*, ___ U.S. ___, 133 S. Ct. 1552; *Schmerber v. California*, 384 U.S. 757 (1966). In *Schmerber*, the Court considered whether the warrantless taking of blood from a person injured in a car crash and arrested for driving under the influence of alcohol violated the Fourth Amendment. 384 U.S. at 766-68. The Court concluded that the warrantless blood draw was not unconstitutional because the officer who ordered the blood draw "might reasonably have believed that he was confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, 'threatened the destruction of evidence.' " *Id.* at 770 (citation omitted). More specifically, the Court explained that

> the percentage of alcohol in the blood begins to diminish shortly after drinking stops, as the body functions to eliminate it from the system. Particularly in a case such as this, where time had to be taken to bring the accused to a hospital and to investigate the scene of the accident, there was no time to seek out a magistrate and secure a warrant.

*Id.* at 770-71. "Given these special facts," the warrantless blood draw did not violate the Fourth Amendment. *Id.* at 771. The Court noted that it "reach[ed] this judgment *only on the facts of the present record.*" *Id.* at 772 (emphasis added).

In *McNeely*, the Court considered "whether the natural metabolization of alcohol in the bloodstream presents a *per se* exigency that justifies an exception to the Fourth

Amendment's warrant requirement for nonconsensual blood testing in all drunk-driving cases." ___ U.S. at ___, 133 S. Ct. at 1556. The Court held that, "while the natural dissipation of alcohol in the blood may support a finding of exigency in a specific case, as it did in *Schmerber*, it does not do so categorically." *Id.* at ___, 133 S. Ct. at 1563. Instead, "[w]hether a warrantless blood test of a drunk-driving suspect is reasonable must be determined case by case based on a totality of the circumstances." *Id.* The Court rejected the assumption that there is never time to secure a warrant in drunk-driving cases, reasoning that the collection of BAC evidence does not present a "now or never" situation because BAC evidence "dissipates over time in a gradual and relatively predictable manner." *Id.* at ___, 133 S. Ct. at 1561. The Court also reasoned that technological advances and changes in court rules since *Schmerber* was decided permit "the more expeditious processing of warrant applications." *Id.* at ___, 133 S. Ct. at 1561-62. Accordingly, the Court declined to "depart from careful case-by-case assessment of exigency," *id.* at ___, 133 S. Ct. at 1561, and instead required that courts determine in each case, based on the totality of the circumstances, whether a warrantless blood test of a drunk-driving suspect is reasonable, *id.* at ___, 133 S. Ct. at 1563. If under the totality of the circumstances law enforcement "can reasonably obtain a warrant before a blood sample can be drawn without significantly undermining the efficacy of the search, the Fourth Amendment mandates that they do so." *Id.* at ___, 133 S. Ct. at 1561. Here, the State has failed to establish, under the standard set out in *McNeely*, that the Fourth Amendment does not mandate a warrant in this case.

## II.

In light of *McNeely* and *Schmerber*, I agree with the court that the relevant inquiry is whether, under all of the facts reasonably available to the officer at the time of the search, it was objectively reasonable for the officer to conclude that he or she was faced with an emergency in which the delay necessary to obtain a warrant, under the circumstances, would "significantly undermin[e] the efficacy of the search."[1] *McNeely*, ___ U.S. at ___, 133 S. Ct. at 1561. But I do not agree that the record in this case meets that standard, particularly in light of the State's burden to establish exigency, *see Welsh*, 466 U.S. at 749-50; *see also State v. Ture*, 632 N.W.2d 621, 627 (Minn. 2001) ("The state bears the burden of establishing an exception to the warrant requirement."), and the deference that must be given to the district court's findings. Although we review the ultimate determination of exigency de novo, we review the district court's factual findings for clear error. *See State v. Zornes*, 831 N.W.2d 609, 621 (Minn. 2013) ("The [district] court's factual findings [relating to a Fourth Amendment search and seizure] are reviewed for clear error, but the de novo standard applies to the application of the facts to the Fourth Amendment . . . ." (citations omitted)).

The district court found that "[t]he blood draw occurred at 11:18 p.m., 50 minutes after the crash was reported," and that "there was thus still 70 minutes remaining to obtain a sample from defendant." The district court also found that "Trooper Martens

[1] While I disagree with the court's conclusion regarding the existence of exigent circumstances, I do agree with the court's discussion in Part II.C regarding the court of appeals' misplaced reliance on the seriousness of the offense being investigated and the fact that the accident scene and hospital were located in different counties.

could have begun the telephonic warrant process even earlier, while driving from the crash site to the [hospital]" because Martens had his personal cell phone with him. These findings are supported by the record, and thus are not clearly erroneous.

In light of these findings regarding the time available to Sergeant Martens, it is clear that the State did not meet its burden to prove exigent circumstances. No finding by the district court or evidence in the record suggests that Sergeant Martens could not have obtained a warrant within the time remaining in the 2-hour window.[2] While the State generally contends that the telephonic warrant process outlined in Minn. R. Crim. P. 36.01-.08 is burdensome and that there is no guarantee that the on-call judge would have answered a call at that time of night, the State presented no evidence establishing approximately how long it would have taken to obtain a warrant or that a judge was *actually* unavailable.[3] Without any evidence establishing such facts, the State cannot meet its burden to show that the delay necessary to obtain a warrant, under the circumstances, "significantly undermin[ed] the efficacy of the search." *McNeely*, ___

---

[2]    Stavish was charged with driving while impaired under Minn. Stat. § 169A.20, subd. 1(5) (2014), which defines impairment as an alcohol concentration of 0.08 or greater measured within 2 hours of the time of driving. I do not disagree with the court's statement that this 2-hour window is relevant to the exigency analysis because collecting a blood sample within that window best ensures that the sample can be used to prove impairment. *Cf. McNeely*, ___ U.S. at ___, 133 S. Ct. at 1563 ("While experts can work backwards from the [blood alcohol concentration] at the time the sample was taken to determine [blood alcohol concentration]at the time of the alleged offense, longer intervals may raise questions about the accuracy of the calculation.").

[3]    I note that the district court judge, who found that the State did not establish the existence of exigent circumstances, is in a better position than this court to understand how long it can take to obtain a telephonic warrant and to determine whether the State's arguments were credible.

U.S. at ___, 133 S. Ct. at 1561. To conclude otherwise is to, in effect, create another per se exigency in contravention of *McNeely*. *Id.* at ___, ___, 133 S. Ct. at 1561, 1563. If the record actually established the burdensome nature of the telephonic warrant process, that would be one thing, but all we have here is the State's assertion, nothing more. If the record established that a judge was actually unavailable, that would be one thing, but all we have here are the State's speculations.

The court, however, asserts that the State met its burden to prove exigent circumstances because Stavish's medical condition was serious, possibly requiring air transport to another medical center, and because his diagnosis and treatment were evolving. The court also relies on the fact that Martens could not verify Stavish's medical condition or need for transport with hospital personnel given limitations imposed by federal and state privacy laws. But what the court ignores is the complete lack of evidence presented by the State regarding the length of time necessary to obtain a warrant. Notwithstanding the uncertainty surrounding Stavish's medical condition and the possibility of air transport, the State failed to establish that Martens could not have obtained a warrant in a sufficiently short period of time—particularly since the district court found that Martens could have taken steps to initiate the telephonic warrant process before arriving at the hospital.

The court draws an analogy to *Schmerber*, 384 U.S. 757, but disregards the key differences between that case and this one. In *Schmerber*, the Court highlighted two "special facts" that, in combination with the natural dissipation of alcohol from the bloodstream, would have led an officer to reasonably believe there was no time to seek

out a magistrate and secure a warrant: "time had to be taken to bring the accused to a hospital and to investigate the scene of the accident." 384 U.S. at 770-71. Those same "special facts" are not present here. Sergeant Martens' testimony established that the hospital was only 10 minutes away and that other officers assumed the responsibility of investigating the scene. Moreover, as noted in *McNeely*, technological advances and changes in court rules in the 47 years since *Schmerber* was decided now permit remote warrant applications and more expeditious warrant processing. 133 S. Ct. at 1561-62; *see also* Minn. R. Crim. P. 36.01-36.08 (outlining the requirements for telephonic warrant applications).

In this context, the mere fact that this case, like *Schmerber*, involved an accident and a seriously injured drunk-driving suspect does not warrant the same result. *McNeely* recognized the need for a case-by-case assessment of exigency—rejecting the argument that there is never time to obtain a warrant in drunk-driving cases. ___ U.S. at ___, ___, 133 S. Ct. at 1561, 1563. Instead, "[i]n those drunk-driving investigations where police officers can reasonably obtain a warrant before a blood sample can be drawn without significantly undermining the efficacy of the search, the Fourth Amendment mandates that they do so." *Id.* at ___, 133 S. Ct. at 1561 (citation omitted). That is the case here. The record fails to establish that a telephonic warrant could not, under the totality of the circumstances—including the proximity of the hospital to the accident scene, the availability of other officers to investigate the scene, and the ability to apply for a warrant by telephone—have been reasonably obtained before the blood draw without "significantly undermining" the validity or admissibility of the corresponding BAC

evidence.  *Id.* at \_\_\_, 133 S. Ct. at 1561.  Therefore, I conclude that the State failed to establish that the delay necessary to obtain a warrant, under the circumstances, "significantly undermin[ed] the efficacy of the search," *id.*, and accordingly, failed to meet its burden to establish exigent circumstances that justified the warrantless and nonconsensual blood draw from Stavish.

To conclude otherwise is to, in effect, create a new per se rule that permits a warrantless, nonconsensual blood draw *any time* a drunk-driving suspect is seriously injured and taken to the hospital.  It is difficult to understand how, if this record is sufficient to justify a warrantless blood draw, *any* record will not be sufficient, at least in the context of an accident.  The only way I can understand this decision is the court, once again, pretending that *McNeely* never happened.  *See State v. Bernard*, 859 N.W.2d 762, 774 (Minn. 2015) (Page, J., & Stras, J., dissenting jointly); *State v. Lindquist*, \_\_\_ N.W.2d \_\_\_, \_\_\_ (Minn. Aug. 19, 2015) (Page, J., dissenting).  In the process, the court not only ignores *McNeely's* requirement of a case-by-case assessment of exigency, but also the basic principle that a warrantless search of a person is presumptively unreasonable, imposing a "heavy burden" on the State "to demonstrate an urgent need" that justifies such a search.  *Welsh*, 466 U.S. at 749-50.

III.

The only remaining question is whether the BAC evidence should nevertheless be admissible under the good-faith exception to the exclusionary rule because the blood draw, at the time it was taken, was deemed constitutional by our pre-*McNeely* precedent, *State v. Netland*, 762 N.W.2d 202 (Minn. 2009), and *State v. Shriner*, 751 N.W.2d 538

D-9

(Minn. 2008).  In *United States v. Davis*, ___ U.S. ___, ___, 131 S. Ct. 2419, 2434 (2011), the United States Supreme Court held that "[e]vidence obtained during a search conducted in reasonable reliance on binding precedent is not subject to the exclusionary rule."  We adopted the *Davis* good-faith exception in *State v. Lindquist*, ___ N.W.2d ___, ___ (Minn. Aug. 19, 2015).  I dissented in *Lindquist* on the basis that the good-faith exception violates Minn. Const. art. I, § 8,[4] *see* ___ N.W.2d at ___ (Page, J., dissenting), and I renew those sentiments here.  The adoption of the good-faith exception mocks the constitutionally mandated guarantee of a "certain remedy in the laws" by leaving those whose rights have been violated by an illegal search without such a remedy.  It also mocks the legislatively created remedy for illegal searches and seizures in Minn. Stat. § 626.21 (2014).  *See Lindquist*, ___ N.W.2d at ___ (Lillehaug, J., dissenting).

For these reasons, I respectfully dissent.

---

[4]     Article I, section 8, of the Minnesota Constitution provides:

Every person is entitled to a certain remedy in the laws for all injuries or wrongs which he may receive to his person, property or character, and to obtain justice freely and without purchase, completely and without denial, promptly and without delay, conformable to the laws.