*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A12-2135**

State of Minnesota,
Respondent,

vs.

Dean James Roehler,
Appellant.

**Filed April 4, 2016
Affirmed
Stauber, Judge**

Hubbard County District Court
File No. 29-CR-11-1414

William Ward, State Public Defender, Richard A. Schmitz, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Lori Swanson, Attorney General, Karen B. Andrews, Assistant Attorney General, St. Paul, Minnesota; and

Donovan D. Dearstyne, Hubbard County Attorney, Park Rapids, Minnesota (for respondent)

Considered and decided by Cleary, Chief Judge; Stauber, Judge; and Kirk, Judge.

**U N P U B L I S H E D   O P I N I O N**

**STAUBER**, Judge

This matter is before us on remand from the Minnesota Supreme Court, which

directed this court to reconsider our earlier decision in light of the supreme court's

decisions in *State v. Stavish*, 868 N.W.2d 670 (Minn. 2015), and *State v. Lindquist*, 869 N.W.2d 863 (Minn. 2015). We affirm.

**FACTS**

On July 14, 2011, at about 5:15 p.m., appellant Dean Roehler was involved in a head-on car collision. Roehler's car crossed over the centerline of Highway 34 and collided with a van traveling in the opposite direction, killing the van driver and injuring two passengers, the driver's daughter-in-law and grandchild. Roehler was also seriously injured; he was unconscious, and emergency personnel worked for 45 minutes to extract him from his car.

Minnesota State Trooper Nick Tabbert assisted at the scene of the accident. Roehler was placed in an ambulance for transport to the nearest airport to be airlifted to Essentia Health Hospital in Fargo, North Dakota. In the ambulance, Tabbert smelled an odor of alcohol and asked the flight nurse to draw a blood sample for alcohol-concentration testing, although he did not have a warrant authorizing the blood draw. This blood sample was drawn about 6:31 p.m. or a little more than one hour after the accident. The blood was drawn near an intravenous (IV) line that was also being used to give Roehler fluids, and Tabbert could tell that the sample was diluted. Tabbert contacted Minnesota State Trooper Mark Herbranson and directed him to go to the Fargo hospital and obtain another blood sample from Roehler.

After arriving at the hospital, emergency room staff drew a blood sample for medical purposes at approximately 8:07 p.m. The state subsequently obtained a search warrant for the results of this blood sample, which showed that Roehler had a blood-

alcohol concentration (BAC) of 0.086.  The record does not indicate that Herbranson was aware of this blood draw.

Herbranson obtained a third blood sample at the hospital at 8:58 p.m., but he did not obtain a warrant before doing so.  Roehler was in radiology shortly before going into surgery when an emergency room nurse used the state patrol blood draw kit to take the sample.  Herbranson could not identify Roehler at trial because he was "wrapped up pretty bad . . . on the cart, and . . . he was basically critical at the time."  Roehler regained consciousness two days later and remained in the hospital for 23 days.

Roehler was charged with eleven criminal counts, including three counts of criminal vehicular homicide, six counts of criminal vehicular operation, and two counts of driving while impaired (DWI).  At trial, Donna Zittel, a forensic toxicology specialist at the Bureau of Criminal Apprehension (BCA) crime lab, testified that both the 6:31 p.m. blood draw and the 8:58 p.m. blood draw showed a BAC of 0.05., but she also testified that, in general, a blood draw near an IV site is not accurate because it includes fluids entering the patient's arm from the IV.  She noted that because the 6:31 p.m. blood draw may have been diluted, the sample was not valid for use in reverse extrapolation to determine Roehler's BAC at the time of the accident.  Instead, Zittel used the 8:58 p.m. blood draw to extrapolate back to the time of the accident, taking into account the average burn-off rate of alcohol.  She concluded that Roehler likely had a BAC of between 0.08 and 0.14 at the time of the accident.  Zittel also testified that the rate at which alcohol diminishes in the blood is not affected by drugs or trauma.

Two witnesses testified that they smelled alcohol on Roehler after the accident, and an accident-reconstruction expert testified that the accident was caused by human error and not by a mechanical defect or other cause. Roehler denied having more than two or three beers during the day. He remembered nothing from a point shortly before the accident until he awoke in the hospital two days later.

Roehler was convicted by a jury of all eleven criminal counts. He appealed his convictions, but while his direct appeal was pending, the United States Supreme Court issued its opinion in *Missouri v. McNeely*, 133 S. Ct. 1552 (2013). In that opinion, the Supreme Court ruled that dissipation of alcohol in the blood does not constitute a per se exigency that permits a warrantless nonconsensual blood draw that would otherwise violate the Fourth Amendment, and that exigency must be decided on a case-by-case basis with reference to the totality of the circumstances. *Id.* at 1568. Roehler moved to stay his appeal pending a postconviction proceeding in the district court. The district court denied the postconviction petition, and Roehler's direct appeal was reinstated, including issues determined in the postconviction proceeding. This court reversed Roehler's convictions because of the warrantless blood draw and remanded the matter to the district court for a new trial, but declined to consider Roehler's ineffective-assistance-of-counsel claim based on counsel's failure to challenge admission of the medical blood draw on grounds of physician/patient privilege.

The state petitioned for further review, alleging that the warrantless blood draw was lawful under the Fourth Amendment because it was based on "the totality of exigent circumstances," and that "the good faith exception to the exclusionary rule nevertheless

4

support[s] admission of the evidence obtained from the warrantless blood draws." The supreme court stayed review, "pending final disposition in *State v. Stavish. . .* and *State v. Lindquist*."

On August 19, 2015, the supreme court issued opinions in *Lindquist* and *Stavish*. The supreme court vacated this court's decision in *Roehler* and remanded with the directive to this court "to consider the application of *Stavish* and *Lindquist* to this appeal, and if necessary, any additional issues that respondent raised in his appeal that were not addressed in the court of appeals' decision of October 6, 2014." Roehler raised two issues in his appeal: (1) whether the warrantless blood draw was unlawful under *Missouri v. McNeely* and (2) whether he was deprived of his right to a fair trial through ineffective assistance of counsel.

## DECISION

### I.

In *McNeely*, the United States Supreme Court held that the evanescent nature of alcohol in the blood did not provide a single-factor exigency exception to the search-warrant requirement for nonconsensual blood testing in drunk-driving cases. 133 S. Ct. at 1568. This was a departure from established precedent; previously, the Supreme Court held that a nonconsensual blood draw was a reasonable search that could be made without a warrant because the rapid dissipation of alcohol created an exigent circumstance that provided an exception to the warrant requirement. *Schmerber v. California*, 384 U.S. 757, 770-71, 86 S. Ct. 1826, 1835-36 (1966). The Minnesota Supreme Court approved this reasoning in *State v. Shriner*, permitting a warrantless,

nonconsensual blood draw when a police officer had probable cause to believe that the defendant committed criminal vehicular homicide. 751 N.W.2d 538, 549-50 (Minn. 2008). Thus, at the time of Roehler's accident, the binding appellate precedent of *Schmerber* and *Shriner* permitted a warrantless blood draw in an accident involving suspected criminal vehicular homicide.

In its recent opinion in *Lindquist*, the Minnesota Supreme Court recognized a narrow good-faith exception to the warrant requirement when a police officer "acts in objectively reasonable reliance on binding appellate precedent" and "the binding precedent . . . specifically authorize[s] the behavior." 869 N.W.2d at 877. Roehler's accident occurred before the Supreme Court issued the *McNeely* opinion, and, therefore, the troopers here were acting on the binding appellate precedent of *Schmerber* and *Shriner*, which specifically authorized a warrantless blood draw in an accident involving suspected criminal vehicular homicide.[1]

Although in *Lindquist* law enforcement attempted to obtain a blood draw within the two-hour statutory period set forth in Minn. Stat. § 609.21 (2012) and Minn. Stat. § 169A.20, subd. 1(5) (2012) (stating that a person who operates a motor vehicle with a BAC of 0.08 or greater within two hours of the time driving is guilty of criminal vehicular homicide or DWI), neither statute requires testing within two hours. Section 609.21 provides that a person is guilty of criminal vehicular homicide if he operates a

---

[1] We note that application for a warrant from a North Dakota judge may have confronted Herbranson, a Minnesota state trooper, with a more time-consuming task, contributing to a good-faith belief in the existence of exigent circumstances.

6

motor vehicle "while having an alcohol concentration of 0.08 or more" *or* "while having an alcohol concentration of 0.08 or more, as measured within two hours of the time of driving." Section 169A.20, subdivision 1(5), provides that a person is guilty of driving while impaired if "the person's alcohol concentration at the time, *or* as measured within two hours of the time, of driving . . . is 0.08 or more." (Emphasis added). A test is not invalid if taken outside of the two-hour window of time; rather, extrapolation by an expert is required to correlate the results of the test with driving conduct that occurred more than two hours before the test was administered. *See State v. Banken*, 690 N.W.2d 367, 372 (Minn. App. 2004) (concluding that test taken more than two hours after driving can be used as proof that a driver's BAC was greater than 0.08 at the time of driving); *see also* Minn. Stat. § 169A.45, subd. 4 (2010) (describing tests taken more than two hours after the alleged violation as "competent evidence"). Zittel testified at trial that Roehler's alcohol concentration exceeded 0.08 at the time of driving, by extrapolating from the 8:58 p.m. blood test drawn at Herbranson's request. In *McNeely*, the U.S. Supreme Court reasoned that the evanescent nature of alcohol did not create an exigent circumstance precisely because an expert could determine alcohol concentration by extrapolation. 133 S. Ct. at 1561-63. Despite the factual differences between this case and *Lindquist*, we nevertheless conclude that law enforcement was acting under the limited good-faith exception set forth in *Lindquist*, and the warrantless blood draw taken from Roehler at the hospital was lawful.

## II.

The supreme court also directed us to consider its decision in *Stavish*. There, the defendant was seriously injured and his passenger was killed in a one-car rollover accident. 868 N.W.2d at 672. The defendant was transported to a hospital for treatment. *Id.* at 673. Investigators concluded that alcohol may have been a factor in the accident, and a police officer was sent to the hospital where the defendant was being treated by "multiple medical personnel." *Id.* Stavish admitted that he had been drinking; therefore, the police officer directed the emergency room nurse to draw a blood sample, which showed a BAC of 0.20. *Id.* The officer had not attempted to seek a warrant because he believed that under existing law he had the authority to get a blood test, wanted to obtain the sample within the two-hour statutory period, and thought it was possible that the defendant would be airlifted to a trauma center, although he did not ask hospital staff if this was planned. *Id.*

Stavish was charged with multiple criminal counts of alcohol and driving-related offenses, and he moved pretrial to suppress the warrantless blood-draw results, citing *McNeely*, which had been decided in the interim between the accident and the omnibus hearing. *Id.* at 672-73. The district court suppressed the results, but this court reversed, "concluding that the State established exigent circumstances that justified the warrantless search." *Id.* at 672. On review, the supreme court affirmed this court, concluding that the totality of the circumstances supported a finding of exigency. *Id.*

The supreme court listed the following as circumstances supporting exigency: (1) there was a single-car accident involving a fatality; (2) the driver was seriously

8

injured; (3) the driver, who had been transported to the hospital, might be airlifted to another hospital; (4) alcohol was involved in the accident; (5) multiple medical personnel were attending to the driver; (6) the officer did not know how long the driver would be at the hospital or whether "further medical care would preclude obtaining a sample"; (7) federal and state privacy laws limited the amount of information the officer could discover about the driver's medical condition; and (8) the officer was attempting to get a blood sample within the statutory two-hour period. *Id.* at 677-79. Each one of these circumstances was present here, except the last: Roehler's blood draw occurred outside of the statutory two-hour period.

In *Stavish*, the supreme court discounted the argument that the officer did not even attempt to obtain a telephone warrant or establish how long it would have taken to get a warrant, writing that "the seriousness and uncertainty of Stavish's condition, coupled with the possibility of transport to another hospital, made it impossible for [the officer] to know how long Stavish would be available for a blood draw." *Id.* at 679-80. The supreme court concluded that the officer "was faced with an emergency situation in which it was reasonable to conclude that *any* delay necessary to obtain a warrant would 'significantly undermin[e] the efficacy of the search.'" *Id.* at 680 (quoting *McNeely*, 133 S. Ct. at 1561).

We review the district court's findings for clear error and its ultimate conclusion about whether there were exigent circumstances de novo. *Id.* at 677. Here, the postconviction court made findings similar to those in *Stavish*; although Roehler was not facing transport to another hospital, he was scheduled to go into surgery, which would

9

have made him unavailable for a blood draw. These findings are supported by the record and are not clearly erroneous. We conclude that, based on the totality of the circumstances, exigent circumstances existed that excused the search-warrant requirement.

### III.

Because this court reversed Roehler's conviction on the search-warrant issue, we did not address his claim of ineffective assistance of counsel. Both parties rely on their original briefs for analysis of this issue. Roehler argues that his trial counsel's representation was ineffective because he failed to object to admission of the medical blood-draw results on grounds of physician/patient privilege.

Ineffective-assistance-of-counsel claims are reviewed under a two-pronged test. *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984). To sustain a claim of ineffective assistance of counsel, a defendant must show that "(1) his counsel's performance fell below an objective standard of reasonableness, and (2) that a reasonable probability exists that the outcome would have been different but for counsel's errors." *Andersen v. State*, 830 N.W.2d 1, 10 (Minn. 2013). An appellate court reviews an ineffective-assistance-of-counsel claim de novo, as a mixed question of fact and law. *State v. Rhodes*, 657 N.W.2d 823, 842 (Minn. 2003). A reviewing court need not address both test prongs if one is dispositive. *Andersen*, 830 N.W.2d at 10. There is a presumption that counsel's performance is reasonable and questions of strategy are generally not reviewed. *Id.* But counsel's trial strategy must be objectively reasonable. *State v. Nicks*, 831 N.W.2d 493, 506 (Minn. 2013). If counsel fails to investigate facts

10

directly related to the defendant's theory of the case, his representation may be ineffective. *Id.*

Roehler's counsel objected at the omnibus hearing to admission of all three blood tests. Counsel objected to the first and third blood tests for foundational reasons: the information appeared inaccurate or incomplete and the proponent of the test results was not qualified as a witness. He objected to the medical blood draw because "by its own terms, [it] is not to be used for legal purposes," and challenged the procedures used. This objection falls short of a claim of physician/patient privilege.

During the postconviction hearing, Roehler's counsel was questioned about the failure to object. He stated, "I did not consider the medical privilege objection [at trial] simply because of the fact that there was . . . the other test taken by the state trooper at the hospital. And that had been deemed admissible by the Court at the omnibus hearing." He stated that if the other two tests had been suppressed, he "[a]bsolutely" would have raised medical privilege, but he decided to let the medical results come into evidence at trial because he thought that an argument about endogenous production of alcohol, "that is what happens with people when they're injured seriously, whether or not it produces ethanol within the body, was about the only good shot left of getting something so that we could argue . . . they didn't have evidence beyond a reasonable doubt." He also wanted the medical reports in evidence to show how seriously Roehler was injured, "thus giving . . . the possibility of the jury giving some thought to the endogenous production of ethanol."

Based on trial counsel's testimony, (1) he was aware of the existence of physician/patient privilege; (2) he would have raised the privilege if the other two blood tests were suppressed; and (3) he ultimately wanted Roehler's complete medical records received in evidence so that he could argue a certain theory of the case. Thus, because Roehler's counsel's decisions were strategic and objectively reasonable, they do not support an ineffective-assistance-of-counsel claim.

**Affirmed.**