¶ 1.
PATIENCE DRAKE ROGGENSACK, C. J.
This case comes before us by certification from the court of appeals. David Howes was charged with operating a vehicle while intoxicated (OWI) (fourth offense while having a prior OWI within five years) in violation of Wis. Stat. § 346.63(l)(a) (2013-14)[1] and operating a vehicle with a prohibited alcohol concentration (PAC) (fourth offense while having a prior PAC within five years) in violation of § 346.63(l)(b) based on analysis of his blood showing a blood alcohol concentration of 0.11 percent.
¶ 2. Howes moved to suppress the results of a warrantless blood draw, arguing that the deputy that arrested Howes lacked probable cause to do so and, additionally, that the deputy violated Howes' rights by obtaining a warrantless blood draw. The circuit court *479 granted Howes' motion to suppress.[2] The circuit court concluded that the deputy had probable cause to arrest Howes. However, the court reasoned, relying heavily on State v. Padley, 2014 WI App 65, 354 Wis. 2d 545, 849 N.W.2d 867, that the section of Wisconsin's implied consent statutes that permits a blood draw from an unconscious individual is unconstitutional, unless exigent circumstances exist. Because the circuit court concluded that none existed, it suppressed the report of Howes' blood alcohol concentration.[3]
¶ 3. We conclude that the circuit court correctly determined that the deputy had probable cause to arrest Howes for operating a vehicle with a PAC, and that Howes was arrested prior to obtaining a blood sample. Moreover, based on the totality of circumstances herein, the deputy's warrantless search was permissible under the Fourth Amendment of the United States Constitution and Article I, Section 11 of the Wisconsin Constitution under the exigent circumstances doctrine that relates to the risk of destruction of evidence.[4] Stated more fully, under the totality of circumstances presented herein, which included a seriously injured, unconscious person, who was being subjected to medical treatments for his injuries and who had 0.02 percent as his PAC threshold, a reason *480 able officer could have concluded that further delay in drawing Howes' blood would have led to the destruction of evidence through the dissipation and dilution of alcohol in Howes' bloodstream. Therefore, we reverse the order of the circuit court and remand for further proceedings.
I. BACKGROUND
¶ 4. At approximately 9:18 p.m. on July 7, 2013, Deputy Robert Schiro of the Dane County Sheriffs Office received a call from dispatch indicating that an individual had been in a motorcycle crash with a deer. Dispatch detailed that the driver was unconscious. Deputy Schiro arrived at the scene of the accident and found the deceased deer and the motorcycle in the middle of the road. The driver of the motorcycle was the defendant in the present case, David Howes. He was positioned approximately 40 feet away from the deer and was seriously injured and unconscious. When the deputy arrived, Emergency Medical Services (EMS) was already attending to Howes.
¶ 5. At the scene, there were several bystanders situated near EMS and the ambulance. The deputy unsuccessfully searched for a witness that had observed the accident. Though unsuccessful, the deputy testified that an individual approached him and, referring to Howes, stated he smelled an odor of intoxicants. As the lone police officer at the scene, the deputy had multiple responsibilities relating to containing the accident scene and was unable to obtain the individual's name.
¶ 6. While EMS continued to attend to Howes, the deputy had to ensure the safety of those traveling through the accident scene because a dead deer and a *481 motorcycle were partially blocking the road. The deputy began to direct traffic lanes that ran through the scene of the accident. The deputy also ensured that no one moved the motorcycle and preserved other evidence relating to the accident. The deputy asked bystanders to move out of EMS's way. During his investigation, other officers arrived, and Howes, still unconscious, was transported to the hospital.
¶ 7. The deputy then left to go to the hospital to follow up with Howes. During the drive to the hospital, the deputy checked Howes' Department of Transportation records. He testified that his purpose was to confirm that the motorcycle driver was in fact Howes and to check Howes' driving record. As a result of this record check, the deputy discovered that Howes had three prior OWI/PAC convictions. These prior convictions signaled to the deputy that Howes had a PAC threshold more restrictive than the usual 0.08 percent. Specifically, Howes violated the law if he had operated the motorcycle with a blood alcohol concentration of as little as 0.02 percent.[5]
¶ 8. After the deputy arrived at the hospital, he immediately spoke with the two Emergency Medical Technicians (EMTs), who were in the ambulance with Howes as he was transported to the hospital. The deputy inquired about whether either of the EMTs had smelled alcohol on Howes' breath. The deputy testified that the EMT positioned in the ambulance near Howes' head smelled a "high odor of intox coming from" Howes. The EMT positioned in the ambulance at Howes' feet did not smell intoxicants.
¶ 9. The deputy proceeded to the emergency room in which medical staff was treating Howes. The *482 deputy testified that "numerous nurses and medical staff [were] attending to [Howes] at the time." The ongoing medical treatment prevented the deputy from approaching Howes. However, one nurse told the deputy that there was a strong odor of intoxicants in Howes' room.
¶ 10. The deputy observed that Howes had not regained consciousness and that he was intubated to assist his breathing. The deputy spoke with a physician with regard to Howes' medical condition. The physician said that Howes was in critical condition and possibly had a brain injury. He said that Howes needed a CT scan to further evaluate his injuries.
¶ 11. At approximately 10:15 p.m., the deputy arrested Howes for operating a motor vehicle with a prohibited alcohol concentration. The deputy testified that he arrested Howes for the following reasons: (1) three different individuals smelled an odor of intoxicants emanating from Howes; (2) Howes had a prohibited alcohol concentration threshold of 0.02 percent due to his previous drunk-driving convictions; and (3) the crash.
¶ 12. After arresting Howes, and while Howes was still unconscious, the deputy read Howes the informing the accused form. The deputy asked Howes if he would submit to an evidentiary chemical test of his blood, and Howes did not respond.[6] The deputy then instructed hospital staff to draw a blood sample to test for alcohol concentration.
¶ 13. At 11:17 p.m., roughly two hours after the accident and an hour after the deputy asked hospital staff to draw Howes' blood, a phlebotomist completed *483 the blood draw. The deputy testified that the hour delay occurred either because medical personnel at the hospital were too busy to draw the blood, or Howes may have had a CT scan during this interim period.[7] The report of the blood test stated that Howes had a 0.11 percent blood alcohol concentration. This was well in excess of the 0.02 percent prohibited alcohol concentration threshold to which he was subjected due to his prior drunk-driving convictions.
¶ 14. Howes was charged with operating a vehicle while intoxicated (OWI) (fourth offense while having a prior OWI within five years) in violation of Wis. Stat. § 346.63(l)(a) and operating a vehicle with a prohibited alcohol concentration (PAC) (fourth offense while having a prior PAC within five years) in violation of § 346.63(1)(b). Howes moved to suppress the report that resulted from the blood draw. The circuit court granted Howes' motion. First, the circuit court concluded that the deputy had probable cause to arrest Howes. The court based its conclusion, in part, on the statements to the deputy by various individuals indicating that there was a smell of intoxicants coming from Howes. The court also concluded that "central to the probable cause determination [was] that this was a gentleman who had three prior convictions," and was subject to a PAC threshold of 0.02 percent, rather than 0.08 percent. As part of this determination, the court found that the deputy had searched Howes' driving record prior to arresting Howes; and therefore, he knew that Howes was subject to a PAC threshold of 0.02 percent.
*484 ¶ 15. Next, the circuit court addressed the constitutionality of Wisconsin's implied consent statute as it relates to unconscious persons, Wis. Stat. § 343.305(3)(b). The court concluded that § 343.305(3)(b), which allows withdrawal of blood from an unconscious person, is unconstitutional if the blood draw is done without a warrant or the presence of exigent circumstances. After finding the statute unconstitutional, the circuit court, without analysis, concluded that there were no exigent circumstances presented by this case.
¶ 16. The State appealed and the court of appeals certified the case for our review. We now reverse.
II. DISCUSSION
A. Standard of Review
¶ 17. "Our review of an order granting or denying a motion to suppress evidence presents a question of constitutional fact." State v. Tullberg, 2014 WI 134, ¶ 27, 359 Wis. 2d 421, 857 N.W.2d 120 (quoting State v. Robinson, 2010 WI 80, ¶ 22, 327 Wis. 2d 302, 786 N.W.2d 463). "When presented with a question of constitutional fact, this court engages in a two-step inquiry." Robinson, 327 Wis. 2d 302, ¶ 22.
¶ 18. First, the circuit "court's findings of eviden-tiary or historical fact will not be overturned unless they are clearly erroneous." State v. Richter, 2000 WI 58, ¶ 26, 235 Wis. 2d 524, 612 N.W.2d 29. Next, we "independently determine whether the historical or evidentiary facts establish exigent circumstances sufficient to justify the warrantless" search. Id.
¶ 19. In the present case, we apply this two-step inquiry to determine whether the warrantless blood *485 draw was reasonable under the Fourth Amendment of the United States Constitution and Article I, Section 11 of the Wisconsin Constitution.
B. General Principles
¶ 20. A blood draw is a search of the person. Tullberg, 359 Wis. 2d 421, ¶ 31 ("A blood draw to uncover evidence of a crime is a search within the meaning of the Fourth Amendment."). At issue in the present case is whether the deputy acted reasonably in instructing hospital personnel to draw Howes' blood when he did not have a warrant. Accordingly, we must determine whether the deputy's warrantless search of Howes was permissible under the Fourth Amendment and Article I, Section 11.
¶ 21. "The Fourth Amendment to the United States Constitution and Article I, Section 11 of the Wisconsin Constitution protect the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Id., ¶ 29 (quoting Robinson, 359 Wis. 2d 421, ¶ 24). "The touchstone of the Fourth Amendment is reasonableness." Id. (internal quotation marks omitted). As such, "[t]he Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable." Id. (internal quotation marks omitted). "An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed objectively, justify [the] action.'" Brigham City, Utah v. Stuart, 547 U.S. 398, 404 (2006) (quoting Scott v. United States, 436 U.S. 128, 138 (1978)).
*486 ¶ 22. Absent from the text of the Fourth Amendment is the obligation that the government must obtain a warrant to conduct a search. However, it is axiomatic that "warrants must generally be obtained." Missouri v. McNeely, 133 S. Ct. 1552, 1569 (2013) (Roberts, C.J., concurring in part and dissenting in part). Consistent with these principles, "[a] warrant-less search is presumptively unreasonable." Tullberg, 359 Wis. 2d 421, ¶ 30.
¶ 23. To overcome this presumption, a warrant-less search must fall under an exception to the warrant requirement. See State v. Foster, 2014 WI 131, ¶ 32, 360 Wis. 2d 12, 856 N.W.2d 847 ("Consistent with the United States Supreme Court's interpretation of the Fourth Amendment, we have adhered to the basic principle that warrantless searches are per se unreasonable unless they fall within a well-recognized exception to the warrant requirement."). "One exception to the warrant requirement is the exigent circumstances doctrine, which holds that a warrantless search complies with the Fourth Amendment if the need for a search is urgent and insufficient time to obtain a warrant exists." Tullberg, 359 Wis. 2d 421, ¶ 30.
¶ 24. "There are four well-recognized categories of exigent circumstances ... 1) hot pursuit of a suspect, 2) a threat to the safety of a suspect or others, 3) a risk that evidence will be destroyed, and 4) a likelihood that the suspect will flee." Richter, 235 Wis. 2d 524, ¶ 29. The burden is on the government to establish that its actions fit into one of the well-recognized exceptions. State v. Phillips, 2009 WI App 179, ¶ 7, *487 322 Wis. 2d 576, 778 N.W.2d 157. And, "the test for determining the existence of exigent circumstances is an objective one." Robinson, 327 Wis. 2d 302, ¶ 30.
¶ 25. If exigent circumstances are present, we have distilled four additional requirements that a warrantless blood draw in a drunk driving case must satisfy to be reasonable under the Fourth Amendment:
(1) the blood draw is taken to obtain evidence of intoxication from a person lawfully arrested for a drunk-driving related violation or crime, (2) there is a clear indication that the blood draw will produce evidence of intoxication, (3) the method used to take the blood sample is a reasonable one and performed in a reasonable manner, and (4) the arrestee presents no reasonable objection to the blood draw.
State v. Kennedy, 2014 WI 132, ¶ 17, 359 Wis. 2d 454, 856 N.W.2d 834 (quoting State v. Bohling, 173 Wis. 2d 529, 534, 494 N.W.2d 399 (1993) abrogated in part by Missouri v. McNeely, 133 S. Ct. 1552 (2013)). We have "explained that probable cause to arrest for a drunk-driving related violation or crime 'substitutes for the predicate act of lawful arrest' under the first factor." Id. (quoting Bohling, 173 Wis. 2d at 534 n.1). "The second factor, whether there is a clear indication that the blood draw will produce evidence of intoxication, in this case is also satisfied by the same facts that support a finding of probable cause to arrest." Id. (internal quotation marks omitted).
¶ 26. In the present case, there is no dispute as to the presence of the third and fourth factors. The blood was drawn in a reasonable manner; it was taken in a hospital by a person authorized to draw blood. See State v. Krajewski, 2002 WI 97, ¶ 47, 255 Wis. 2d 98, 648 N.W.2d 385 ("Krajewski and the State stipulated *488 that the blood draw was taken in a hospital by a registered nurse. Thus, the blood draw was effected in a reasonable manner."). Similarly, with respect to the fourth factor, the suspect did not present a reasonable objection to the type of search the deputy sought to conduct, a blood draw.[8] Accordingly, we must examine whether the deputy lawfully arrested Howes based on probable cause that Howes had driven with a prohib *489 ited alcohol concentration, i.e., 0.02 percent or higher. Next, we must determine whether exigent circumstances existed such that the deputy was justified in proceeding without a warrant.
C. Probable Cause to Arrest
¶ 27. With respect to the probable cause analysis, the deputy in this case arrested Howes; therefore, the dispositive inquiry is whether the deputy had probable cause to conduct this arrest. We conclude that the deputy had probable cause to arrest Howes for operation of a vehicle with a prohibited alcohol concentration under the facts as found by the circuit court.
¶ 28. 'Warrantless arrests are unlawful unless they are supported by probable cause." State v. Blatterman, 2015 WI 46, ¶ 34, 362 Wis. 2d 138, 864 N.W.2d 26. "Probable cause to arrest. . . refers to that quantum of evidence within the arresting officer's knowledge at the time of the arrest that would lead a reasonable law enforcement officer to believe that the defendant was operating a motor vehicle [at a prohibited alcohol concentration]." Id. (quoting State v. Lange, 2009 WI 49, ¶ 19, 317 Wis. 2d 383, 766 N.W.2d 551). "The burden is on the state to show [it] had probable cause to arrest." Id. (internal quotation marks omitted). And, "[w]e evaluate the existence of probable cause objectively, concerned with whether law enforcement acted reasonably." Robinson, 327 Wis. 2d 302, ¶ 26.
¶ 29. We look at the "totality of the circumstances to determine whether probable cause . . . existed." Tullberg, 359 Wis. 2d 421, ¶ 33. "In dealing *490 with probable cause, ... as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Illinois v. Gates, 462 U.S. 213, 231 (1983) (quoting Brinegar v. United States, 338 U.S. 160, 175 (1949)). "This standard is case-specific: ' [t]he quantum of information which constitutes probable cause to arrest must be measured by the facts of the particular case.'" Blatterman, 362 Wis. 2d 138, ¶ 35 (quoting State v. Paszek, 50 Wis. 2d 619, 625, 184 N.W.2d 836 (1971)).
¶ 30. A number of factors may be relevant to a determination of probable cause in the context of an arrest for a drunk-driving related offense. As we have previously detailed, "factors sufficient to support a finding of probable cause have included bloodshot eyes, an odor of intoxicants, and slurred speech, together with a motor vehicle accident or erratic driving." Kennedy, 359 Wis. 2d 454, ¶ 22.
¶ 31. Additionally," [p] olice may properly consider prior convictions in a probable cause determination." Blatterman, 362 Wis. 2d 138, ¶ 36; see also State v. Goss, 2011 WI 104, ¶ 24, 338 Wis. 2d 72, 806 N.W.2d 918. "Prior convictions are especially relevant in this case because the statute reduced the PAC threshold applicable to [the defendant] from 0.08% to 0.02% alcohol concentration." Blatterman, 362 Wis. 2d 138, ¶ 36.
¶ 32. In this case, the deputy checked Howes' driving record, which indicated that Howes had three prior OWI/PAC convictions. This lowered Howes' PAC threshold to 0.02 percent. The circuit court properly *491 found this highly relevant in determining that the deputy had probable cause to arrest Howes.
¶ 33. Moreover, three people told the deputy that Howes smelled of intoxicants: (1) an individual at the scene of the accident; (2) one of the EMTs who rode in the ambulance with Howes; and (3) a nurse at the hospital. Taken together with the vehicle accident, these facts were sufficient to provide the deputy with probable cause to arrest Howes for operating a vehicle with a prohibited alcohol concentration.
¶ 34. We note that probable cause in this case developed over a period of time. At the accident scene, one bystander mentioned that Howes may have smelled of intoxicants. While on his way to the hospital, the deputy learned that Howes' PAC threshold had been lowered to 0.02 percent because of his prior convictions for OWI/PAC. Then, at the hospital, the deputy spoke with EMT personnel, one of whom said that Howes smelled of intoxicants and later he spoke with a nurse who also said that Howes smelled of intoxicants. At that point, the deputy reasonably believed that he had probable cause to conclude that Howes had operated his motorcycle with a prohibited alcohol concentration of 0.02 percent. He then placed Howes under arrest. We agree that the deputy had probable cause to believe that Howes had violated Wis. Stat. § 346.63(l)(b) under the provisions of Wis. Stat. § 340.01(46m)(c).
D. Exigent Circumstances
¶ 35. We next examine whether the warrantless blood draw was justified by exigent circumstances. To determine if a warrantless blood draw was permissible *492 under the Fourth Amendment, we look at the totality of the circumstances and engage in a "careful case-by-case assessment of exigency." McNeely, 133 S. Ct. at 1561.
¶ 36. "Like our analysis of probable cause, the test for determining the existence of exigent circumstances is an objective one." Tullberg, 359 Wis. 2d 421, ¶ 41 (quoting Robinson, 327 Wis. 2d 302, ¶ 30). It follows that we give no weight to the subjective belief of an officer.[9] See United States v. Richardson, 208 F.3d 626, 629 (7th Cir. 2000) (reasoning "a police officer's subjective belief that exigent circumstances exist is insufficient to make a warrantless search. Instead, as is normally the case for Fourth Amendment inquiries, the test is objective . . . ."). Accordingly, we independently examine the facts known to the officer at the time of the warrantless search.
¶ 37. An officer is justified in conducting a war-rantless search to prevent the destruction of evidence. And, "[e]vidence of a crime is destroyed as alcohol is eliminated from the bloodstream of a drunken driver." Tullberg, 359 Wis. 2d 421, ¶ 42. While the natural dissipation of alcohol is not, under all circumstances, an exigent circumstance sufficient to allow an officer to conduct a warrantless blood draw, there are situations in which the totality of the circumstances would justify such a search. "[A] warrantless blood draw [need not] always require a 'now or never' situation in order to be justified by exigent circumstances. Rather, exigent circumstances justify a warrantless blood draw if de *493 laying the blood draw would 'significantly undermin[e] [its] efficacy.' " Id., ¶ 50 (quoting McNeely, 133 S. Ct. at 1561); cf. State v. Parisi, 2016 WI 10, ¶ 40, 367 Wis. 2d 1, 875 N.W.2d 619 ("Under the circumstances, Officer Fenhouse might reasonably have feared that if he attempted to obtain a warrant before drawing Parisi's blood, Parisi's condition could again lapse, causing Officer Fenhouse to miss his window of opportunity.").
¶ 38. The United States Supreme Court's decision in Schmerber v. California, 384 U.S. 757 (1966), illustrates a circumstance in which a warrantless blood draw in the context of a drunk-driving offense is reasonable. In Schmerber, an individual was "arrested at a hospital while receiving treatment for injuries suffered in an accident involving the automobile that he had apparently been driving." Id. at 758. Without obtaining a warrant, the officer instructed a physician at the hospital to draw the defendant's blood. Id. "The chemical analysis of this sample revealed a percent by weight of alcohol in his blood at the time of the offense which indicated intoxication, and the report of this analysis was admitted in evidence at the trial." Id. at 759. The defendant objected to the admission of the report and contended, in part, that these results "should be excluded from evidence as the product of an unlawful search and seizure in violation of the Fourth and Fourteenth Amendments." Id. at 766.
¶ 39. The United States Supreme Court rejected the defendant's contention that the warrantless blood draw was unreasonable and concluded that the officer's search was justified by exigent circumstances. Id. at 770. The Court, in part, premised its decision on the defendant's injuries that had delayed the officer's ability to secure a blood draw from the defendant. Specifically, the Court reasoned:
*494 We are told that the percentage of alcohol in the blood begins to diminish shortly after drinking stops, as the body functions to eliminate it from the system. Particularly in a case such as this, where time had to be taken to bring the accused to a hospital and to investigate the scene of the accident, there was no time to seek out a magistrate and secure a warrant. Given these special facts, we conclude that the attempt to secure evidence of blood-alcohol content in this case was an appropriate incident to petitioner's arrest.
Id. at 770-71. Consequently, the Court surmised that "[t]he officer . . . might reasonably have believed that he was confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threatened the destruction of evidence." Id. (internal quotation marks omitted).
¶ 40. Following Schmerber, the Supreme Court in McNeely reaffirmed the principle that dissipation of alcohol from the blood stream may lead to the destruction of evidence, and therefore constitute an exigent circumstance sufficient to justify a warrantless blood draw. McNeely, 133 S. Ct. at 1560 (reasoning, "our analysis in Schmerber fits comfortably within our case law applying the exigent circumstances exception."). The Court clarified that its decision in Schmerber was not predicated solely on the natural dissipation of alcohol from the bloodstream; rather, there were "special facts" that made the blood draw reasonable under the totality of circumstances present in Schmerber. Id. These "special facts" were that the defendant was injured and in the hospital, and that the officer had to investigate the scene of the accident. The Court reasoned,
Regardless of the exact elimination rate, it is sufficient for our purposes to note that because an individual's *495 alcohol level gradually declines soon after he stops drinking, a significant delay in testing will negatively affect the probative value of the results. This fact was essential to our holding in Schmerber, as we recognized that, under the circumstances, further delay in order to secure a warrant after the time spent investigating the scene of the accident and transporting the injured suspect to the hospital to receive treatment would have threatened the destruction of evidence.
Id. at 1560-61. These facts made the officer's need to draw blood more urgent and, given this urgency, the officer's actions were justified under the exigent circumstances doctrine. Id. at 1560 ("We added that '[particularly in a case such as this, where time had to be taken to bring the accused to a hospital and to investigate the scene of the accident, there was no time to seek out a magistrate and secure a warrant.'" (quoting Schmerber, 384 U.S. at 770-71).
¶ 41. Moreover, we note that our decision is consistent with the Supreme Court's narrow holding in McNeely that dissipation of alcohol from the bloodstream, standing alone, does not always constitute an exigent circumstance. The Supreme Court in McNeely did not simultaneously create that which it sought to eradicate. Stated otherwise, McNeely did not create a per se rule that a warrantless blood draw based on the natural dissipation of alcohol from the blood stream is never reasonable. Id. at 1568 ("The relevant factors in determining whether a warrantless search is reasonable, including the practical problems of obtaining a warrant within a timeframe that still preserves the opportunity to obtain reliable evidence, will no doubt vary depending upon the circumstances in the case.").
*496 ¶ 42. Instead, the Court in McNeely validated the foundation of its decision in Schmerber; specifically, dissipation of alcohol from the bloodstream may justify an officer's warrantless blood draw. The Court in McNeely went so far as to recognize that delay in obtaining a warrant, even without the presence of extraneous factors, may justify a warrantless blood draw. The Court stated, "an individual's alcohol level gradually declines soon after he stops drinking, a significant delay in testing will negatively affect the probative value of the results." Id. at 1561; see also id. at 1568 ("No doubt, given the large number of arrests for this offense in different jurisdictions nationwide, cases will arise when anticipated delays in obtaining a warrant will justify a blood test without judicial authorization, for in every case the law must be concerned that evidence is being destroyed.").
¶ 43. As is evident from the Court's analysis in Schmerber and McNeely, certain facts are particularly relevant to an exigent circumstances analysis in drunk-driving cases. Whether an officer was delayed in obtaining a blood draw due to the defendant's medical condition is one such fact. Additionally, whether the officer was delayed because time had to be taken to investigate the scene of the accident is also highly relevant. See Birchfield v. North Dakota, 136 S. Ct. 2160, 2174 (2016) ("On the specific facts of [Schmer-ber}, where time had already been lost taking the driver to the hospital and investigating the accident, the Court found no Fourth Amendment violation even though the warrantless blood draw took place over the driver's objection.").
¶ 44. The Minnesota Supreme Court, relying on these factors, concluded that exigent circumstances *497 justified a search under circumstances similar to that of Schmerber. See Minnesota v. Stavish, 868 N.W.2d 670, 676—77 (Minn. 2015). In Stavish, the Minnesota Supreme Court concluded that, under the totality of circumstances, a warrantless blood draw of a hospitalized individual was justified by exigent circumstances. The Court reasoned, "Stavish's medical condition and need for treatment rendered his future availability for a blood draw uncertain. [The officer] did not know how long Stavish was likely to remain at the same hospital or whether further medical care would preclude obtaining a sample even if Stavish stayed at the same hospital." Id. at 678. As a result, "it was objectively reasonable for [the officer] to conclude that he was faced with an emergency in which the delay necessary to obtain a warrant threatened the destruction of evidence." Id.
¶ 45. The circumstances of a critically injured driver who needed immediate medical care that justified the warrantless blood draw in Schmerber and Stavish are present in the case at hand. And in addition, Howes' prohibited alcohol concentration threshold of 0.02 percent increased the need for a prompt blood draw. Dissipation or dilution of alcohol in his bloodstream due to the passage of time and medical treatments threatened the State's ability to prove the crime for which he was arrested. This is so because "[a]lcohol dissipates from the bloodstream at a rate of 0.01 percent to 0.025 percent per hour." McNeely, 133 S. Ct. at 1570—71 (Roberts, C. J., concurring in part and dissenting in part) (citing Richard Stripp, Forensic and Clinical Issues in Alcohol Analysis, in Forensic Chemistry Handbook 440 (Lawrence Kobilinsky ed., 2012)). If Howes violated his restricted PAC with a blood *498 alcohol concentration of 0.02 percent, it would take approximately an hour for Howes' blood alcohol level to go to 0.00 percent. This is roughly the amount of time that elapsed between Howes' accident and the time in which the deputy first had probable cause necessary to obtain a warrant. As each minute passed, the likelihood that Howes' blood alcohol level would diminish to 0.00 percent increased significantly. At 0.00 percent, it would be impossible to calculate what his blood alcohol level was at the time of the accident.
¶ 46. In addition, similar to the officer in Schmerber, the deputy's responsibilities at the accident scene led to a significant delay in the ability of the deputy to obtain a blood draw. For example, he was required to secure evidence relating to the accident and ensure the safety of those traveling on roads through the scene of the accident. The investigation of the accident took time. During this time, reliable evidence of Howes' blood alcohol concentration was being destroyed by the passage of time and treatment at the hospital.[10]
¶ 47. Furthermore, akin to the defendant in Schmerber, Howes was in critical condition. The severity of Howes' condition made the deputy's ability to obtain a blood draw in the future uncertain. This uncertainty was exacerbated because at least one hour already had passed since the accident and the deputy had no knowledge about the time at which Howes stopped drinking.
*499 ¶ 48. Howes was unconscious, and it was unknown whether he had suffered brain damage. Importantly, a physician indicated that Howes would need a CT scan.[11] The deputy could reasonably have concluded that waiting for a CT scan before obtaining a blood draw would "significantly undermin[e] the efficacy" of the blood analysis to prove Howes violated his PAC threshold of 0.02 percent. See Tullberg, 359 Wis. 2d 421, ¶ 50 n.26 (quoting McNeely, 133 S. Ct. at 1561).
¶ 49. Additionally, as we have explained, the deputy did not have probable cause to arrest Howes until he arrived at the hospital, talked with EMTs and talked with the nurse who told him that she also smelled alcohol. Accordingly, the present case is not one in which the officer could have obtained a warrant on the way to the hospital because he did not have probable cause to obtain a warrant then. Applying for a warrant after his conversations with Howes' caregivers would have led to additional delay and the further dissipation of alcohol from Howes' bloodstream. See id., 359 Wis. 2d 421, ¶ 48 n.25 ("We note that Deputy Hoffman could not have had other officers assist him in obtaining a warrant while he investigated the accident because he did not have probable cause to have Tullberg's blood drawn until immediately before it was drawn.").
¶ 50. Accordingly, we conclude that the warrant-less blood draw from Howes was permissible under the Fourth Amendment of the United States Constitution *500 and Article I, Section 11 of the Wisconsin Constitution because under the totality of circumstances the exigent circumstance of destruction of evidence existed.
III. CONCLUSION
¶ 51. We conclude that the circuit court correctly determined that the deputy had probable cause to arrest Howes for operating a vehicle with a PAC, and that Howes was arrested prior to obtaining a blood sample. Moreover, based on the totality of circumstances herein, the deputy's warrantless search was permissible under the Fourth Amendment of the United States Constitution and Article I, Section 11 of the Wisconsin Constitution under the exigent circumstances doctrine that relates to the risk of destruction of evidence. Stated more fully, under the totality of circumstances presented herein, which included a seriously injured, unconscious person, who was being subjected to medical treatments for his injuries and who had 0.02 percent as his PAC threshold, a reasonable officer could have concluded that further delay in drawing Howes' blood would have led to the destruction of evidence through the dissipation and dilution of alcohol in Howes' bloodstream. Therefore, we reverse the order of the circuit court and remand for further proceedings.
By the Court. —The The order of the circuit court is reversed and the cause is remanded for further proceedings consistent with this opinion.

 All subsequent references to the Wisconsin Statutes are to the 2013—14 version unless otherwise indicated.

 The Honorable John W. Markson of Dane County presided.

 See Wis. Stat. § 343.305(3).

 Because we conclude that the search was reasonable under the totality of circumstances presented herein, we need not reach whether Wis. Stat. § 343.305(3)(b) is facially unconstitutional. See generally, State v. Stoehr, 134 Wis. 2d 66, 70, 396 N.W.2d 177 (1986) ("When this court grants direct review upon certification, it acquires jurisdiction of the appeal, which includes all issues, not merely the issues certified or the issue for which the court accepts the certification.").

 See Wis. Stat. § 340.01(46m)(c).

 The deputy said he took these steps even though Howes was unconscious because he thought he was legally required to do so.

 If a CT scan occurred during this period, it would be consistent with a physician's statement to the deputy shortly after the deputy arrived at the hospital that Howes needed to have a CT scan.

 An analysis under the fourth factor does not require us to determine whether an individual consented to a search; instead, it refers to an objection to the type of search the officer chose to conduct (e.g., a blood draw as opposed to a breathalyzer). See State v. Krajewski, 2002 WI 97, ¶ 48, 255 Wis. 2d 98, 648 N.W.2d 385. As this Court in State v. Kennedy, 2014 WI 132, 359 Wis. 2d 454, 856 N.W.2d 834 recognized, the fourth factor is derived from the Supreme Court's decision in Schmerber v. California, 384 U.S. 757 (1966). In Schmerber, the Supreme Court explained that an analysis under the fourth factor is reserved for those instances in which an individual has raised a legitimate and significant objection to having his or her blood drawn. The Court concluded that the defendant in that case did not raise a reasonable objection to the blood draw because the defendant was "not one of the few who on grounds of fear, concern for health, or religious scruple might prefer some other means of testing, such as the 'Breathalyzer' test petitioner refused." Schmerber, 384 U.S. at 771. See also State v. Krause, 168 Wis. 2d 578, 588, 484 N.W.2d 347 (Ct. App. 1992) ("Krause asserts, however, that his refusal still is constitutionally protected because he told Officer Dornfeld that he 'didn't believe in needles' and 'd[id]n't want AIDS.' This argument fails. These isolated comments do not establish that Krause is 'one of the few who on grounds of fear, concern for health, or religious scruple might prefer some other means of testing' whose wishes the Schmerber Court declined to address."). Consequently, the fourth factor speaks to the reasonableness of the type of search employed, not whether a warrant was required to conduct the search. As such, to say that Howes made no objection to the type of search is not to say that Howes impliedly consented to being searched. Each inquiry is analytically distinct.

 Accordingly, the deputy's testimony that he had time to obtain a warrant in this case is irrelevant to our analysis.

 Howes was in critical condition that required additional testing, intubation to support his respiration. He had been given medication resulting in "heavy sedation," and because he was unconscious, he must have received this medication intravenously.

 The deputy asked hospital staff to conduct a blood draw, but they were unable to draw Howes' blood until roughly an hour after the deputy's request. This passage of time is further evidence that the deputy needed to request a blood draw immediately.