# COURT OF APPEALS OF WISCONSIN
# PUBLISHED OPINION

Case No.: 2019AP1942-CR

†Petition for Review filed

Complete Title of Case:

**STATE OF WISCONSIN,**

**PLAINTIFF-RESPONDENT,**

**V.**

**GERALD P. MITCHELL,**

**DEFENDANT-APPELLANT.†**

| | |
|---|---|
| Opinion Filed: | June 15, 2022 |
| Submitted on Briefs: | February 10, 2022 |
| Oral Argument: | |

| | |
|---|---|
| JUDGES: | Gundrum, P.J., Neubauer and Kornblum, JJ. |
| Concurred: | |
| Dissented: | |

Appellant
ATTORNEYS: On behalf of the defendant-appellant, the cause was submitted on the briefs of *Andrew R. Hinkel*, assistant state public defender of Madison.

Respondent
ATTORNEYS: On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Michael C. Sanders*, assistant attorney general, and *Joshua L. Kaul*, attorney general.

**COURT OF APPEALS**
**DECISION**
**DATED AND FILED**

**June 15, 2022**

Sheila T. Reiff
Clerk of Court of Appeals

**2022 WI App 31**

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2019AP1942-CR**

Cir. Ct. No. **2013CF365**

**STATE OF WISCONSIN**

**IN COURT OF APPEALS**

---

**STATE OF WISCONSIN,**

  **PLAINTIFF-RESPONDENT,**

 V.

**GERALD P. MITCHELL,**

  **DEFENDANT-APPELLANT.**

---

APPEAL from a judgment and an order of the circuit court for Sheboygan County: TERENCE T. BOURKE and REBECCA L. PERSICK, Judges. *Affirmed.*

Before Gundrum, P.J., Neubauer and Kornblum, JJ.

¶1 GUNDRUM, P.J. This operating-a-motor-vehicle-while-intoxicated (OWI) case has a significant history as it has already been to the United States Supreme Court and back. In ***Mitchell v. Wisconsin***, 139 S. Ct. 2525, 2539 (2019) (plurality), the Court held that "[w]hen police have probable cause to believe a person has committed a drunk-driving offense and the driver's unconsciousness or stupor requires him to be taken to the hospital

or similar facility before police have a reasonable opportunity to administer a standard evidentiary breath test," as was the case with Mitchell, they may lawfully order a blood test without a warrant. Such testing will not be determined to have "offend[ed] the Fourth Amendment," the Court continued, unless the defendant shows both (1) "that his blood would not have been drawn if police had not been seeking BAC [blood alcohol concentration] information" and (2) "that police could not have reasonably judged that a warrant application would interfere with other pressing needs or duties." *Id.* The Court remanded the case to afford Mitchell the opportunity to try to make these two showings.

¶2 Following an evidentiary hearing, the circuit court denied Mitchell's suppression motion on the basis that he failed to make these showings.[1] Mitchell appeals this ruling, but we agree with the circuit court and affirm.

### *Background*

¶3 Since our decision today relies heavily upon *Mitchell*, we will also borrow heavily from it for the background.

¶4 When an officer located motorist Mitchell, he was "[s]tumbling and slurring his words" and "could hardly stand without the support of two officers." *Id.* at 2532. With field sobriety tests deemed "hopeless, if not dangerous," the officer arrested Mitchell for OWI and drove him to a police station for a breath test. *Id.* At the station, Mitchell was "too lethargic even for a breath test," so the officer took him to a hospital for a blood draw. *Id.* Before reaching the hospital, Mitchell lost consciousness and "had to be wheeled in." *Id.* Despite Mitchell's lack of consciousness, the officer, pursuant to Wisconsin's Implied Consent Law, "read aloud to a slumped Mitchell the standard statement giving drivers a

---

[1] The Honorable Terence T. Bourke entered the judgment of conviction. The Honorable Rebecca L. Persick held the evidentiary hearing after remand and entered the order denying the motion to suppress.

chance to refuse BAC testing." *Id.* With no response from Mitchell, the officer asked hospital staff to draw his blood. "Mitchell remained unconscious while the sample was taken, and analysis of his blood showed that his BAC … was 0.222%." *Id.*

¶5 Charged with two related drunk-driving violations, Mitchell moved to suppress the results of the blood test, contending "it violated his Fourth Amendment right against 'unreasonable searches' because it was conducted without a warrant." *Id.* The circuit court denied his motion, and he was found guilty of both charges following a jury trial. *Id.* Mitchell appealed, and the Wisconsin Supreme Court accepted our certification and affirmed the convictions. *Id.*

¶6 On further appeal, the United States Supreme Court ultimately considered "what officers may do when a driver's unconsciousness (or stupor) eliminates any reasonable opportunity" for a "reliable, evidence-grade breath test[]" to be performed upon the driver. *Id.* at 2534 (citation omitted). Addressing this issue, the Court declared that, in the OWI context, "exigency *exists* when (1) BAC evidence is dissipating and (2) some other factor creates pressing health, safety, or law enforcement needs that would take priority over a warrant application. Both conditions *are met* when a drunk-driving suspect is unconscious, so … [w]ith such suspects … a warrantless blood draw *is lawful*." *Id.* at 2537 (emphasis added). The *Mitchell* Court further stated that

> unconsciousness does not just create pressing needs; it is *itself* a medical emergency. It means that the suspect *will have to be rushed to the hospital* … not just *for the blood test* itself but *for urgent medical care*. Police can reasonably anticipate that such a driver might require monitoring, positioning, and support on the way to the hospital; that his blood may be drawn anyway, for diagnostic purposes, immediately on arrival; and that immediate medical treatment could delay (or otherwise distort the results of) a blood draw conducted later, upon receipt of a warrant, thus reducing its evidentiary value.

3

*Id.* at 2537-38 (first emphasis in original; citation omitted). Referring to ***Schmerber v. California***, 384 U.S. 757, 770-71 (1966)—in which the Court held that the exigent circumstances doctrine applied to a warrantless blood draw on an intoxicated driver involved in a car accident because of pressing duties related to that accident taking priority over applying for a warrant—the ***Mitchell*** Court continued, "Just as the ramifications of a car accident pushed *Schmerber* over the line into exigency, so does the *condition* of an unconscious driver bring his blood draw under the exception." ***Mitchell***, 139 S. Ct. at 2538 (emphasis added).[2]

¶7    Ultimately, the ***Mitchell*** Court adopted a "rule" for "an entire category of cases"—those in which there is probable cause to believe a driver has committed an OWI offense and the driver is either unconscious, *id.* at 2534 n.2, or in such a stupor that he/she cannot properly perform a breath test, *id.* at 2539.

> When police have probable cause to believe a person has committed a drunk-driving offense and the driver's unconsciousness or stupor requires him to be taken to the hospital or similar facility before police have a reasonable opportunity to administer a standard evidentiary breath test, they may almost always order a warrantless blood test to measure the driver's BAC without offending the Fourth Amendment. We do not rule out the possibility that in an unusual case a defendant would be able to show that his blood would not have been drawn if police had not been seeking BAC information, and that police could not have reasonably judged that a warrant application would interfere with other pressing needs or duties.

*Id.* Because the Court could not "rule out the possibility" that Mitchell's situation could be the "unusual case," it remanded the matter to afford Mitchell the opportunity to try to show "that his blood would not have been drawn if police had not been seeking BAC

---

[2] The Court also expressed that the interests in keeping our highways safe from drunk drivers "are greater" with drunk drivers so inebriated that they cannot properly perform a breath test because "[d]rivers who are drunk enough to pass out at the wheel or soon afterward pose a much greater risk. It would be perverse if the more wanton behavior were rewarded—if the more harrowing threat were harder to punish." ***Mitchell v. Wisconsin***, 139 S. Ct. 2525, 2537 (2019).

information" and "that police could not have reasonably judged that a warrant application would interfere with other pressing needs or duties." *Id.* at 2539.

¶8 Upon remand, the circuit court held an evidentiary hearing at which Mitchell attempted to show these two factors and thus show that the otherwise lawful warrantless blood draw of the unconscious Mitchell was unlawful. Following an evidentiary hearing at which the arresting officer provided testimony relevant to this issue, the circuit court determined that Mitchell failed to show that either factor existed, and it again denied his suppression motion. Mitchell appeals from that ruling.

## *Discussion*

¶9 "The review of a circuit court's order granting or denying a suppression motion presents a question of constitutional fact. We will uphold the court's factual findings unless they are clearly erroneous, but we independently apply constitutional principles to those facts." *State v. Ionescu*, 2019 WI App 68, ¶8, 389 Wis. 2d 586, 937 N.W.2d 90 (citation omitted).

¶10 The key holding of *Mitchell* relevant to this appeal is that

> [w]hen police have probable cause to believe a person has committed a drunk-driving offense and the driver's unconsciousness or stupor requires him to be taken to the hospital or similar facility before police have a reasonable opportunity to administer a standard evidentiary breath test, they may *almost always* order a warrantless blood test to measure the driver's BAC without offending the Fourth Amendment.

*Id.* at 2539 (emphasis added). The only circumstance in which police may not order the test without offending the Fourth Amendment—the "*almost* always" part of the holding—is where *the motorist* shows both that (1) his/her blood "would not have been drawn if police had not been seeking BAC information," and (2) "police could not have reasonably judged that a warrant application would interfere with other pressing needs or duties." *Id.*

5

(emphasis added); *see State v. Richards*, 2020 WI App 48, ¶29 n.4, 393 Wis. 2d 772, 948 N.W.2d 359 ("*Mitchell*'s holding that a defendant must 'show' [these two factors] places the burden on [the defendant] to establish those factors."). Because Mitchell failed to show that the first factor existed in this case,[3] the circuit court correctly determined that the warrantless blood draw was lawful.

¶11    Mitchell suggests we should look to the arresting officer's subjective intent in taking him to the hospital for a blood draw. He points to testimony of the officer that suggests that the reason the officer left the police station to take him to the hospital was to secure BAC evidence, not to ensure he received medical attention. Relatedly, citing *Mitchell*, 139 S. Ct. at 2537-38, he asserts: "As the [*Mitchell*] Court *put it … if* police can 'reasonably anticipate that [a driver's] blood may be drawn anyway, for diagnostic purposes, immediately on arrival' they need not seek a warrant." (Last alteration in original; emphasis added.) Playing off of this, Mitchell then writes that "at the time the officer [in this case] elected to proceed with a warrantless blood draw, he could not 'reasonably anticipate' that Mitchell's blood would be 'drawn anyway' if [the officer] had not 'been seeking BAC information.'" Mitchell expands on this in his reply brief, contending that the officer "had no reason to think Mitchell's blood would be taken if he did not take Mitchell to the hospital for his own [investigatory] purposes."

¶12    The *Mitchell* Court did not "put it" the way Mitchell does. As noted earlier, the *Mitchell* Court stated that an OWI-motorist's unconsciousness

> does not just create pressing needs; it is *itself* a medical emergency. It means that the suspect *will have to be* rushed to the hospital … not just *for the blood test* itself but *for urgent medical care*. Police

---

[3] The circuit court found not only that Mitchell failed to make this necessary showing but that the evidence showed just the opposite, that it was "clearly established" that Mitchell's blood *would have* been drawn even if police were not seeking such information "because his condition was so dire by the time he arrived at the hospital."

> *can* reasonably anticipate that … [the driver's] blood may be drawn anyway, for diagnostic purposes, immediately on arrival.

*Id.* at 2537-38 (first emphasis in original). ***Mitchell*** does not, as Mitchell represents, indicate that a warrantless blood draw of an unconscious OWI-motorist is constitutional only "if" an officer in a particular case "can reasonably anticipate that [the driver's] blood may be drawn anyway, for diagnostic purposes, immediately on arrival." Rather, the Court stated that where there is probable cause to believe an unconscious person has operated a vehicle while intoxicated, the person "will have to be" rushed to a hospital for a "blood test"[4] *and* "urgent medical care."[5] *Id.* The Court did express that police can reasonably anticipate or expect that medical personnel "may" draw such a motorist's blood for medical reasons, *id.* at 2538, but whether or not a particular officer does in fact anticipate that a draw will occur for such reasons in a particular case is completely irrelevant to the legality

---

[4] The Court further stated that because "BAC tests are crucial links in a chain on which vital interests hang[,] when a breath test is unavailable to advance those aims," a blood test becomes "essential," *Mitchell*, 139 S. Ct. at 2535, and "necessary," *id.* at 2536-37 (citation omitted).

[5] The Mayo Clinic describes alcohol poisoning as

> a serious—and sometimes deadly—consequence of drinking large amounts of alcohol in a short period of time. Drinking too much too quickly can affect your breathing, heart rate, body temperature and gag reflex and potentially lead to a coma and death.
>
> .…
>
> A person with alcohol poisoning needs immediate medical attention. If you suspect someone has alcohol poisoning, call for emergency medical help right away.

*See*, *e.g.,* Alcohol Poisoning: Symptoms & Causes, http://mayoclinic.org/diseases-conditions/alcohol-poisoning/symptoms-causes/syc-20354386 (last visited June 7, 2022).

Relatedly, the *Mitchell* Court noted that "[s]erum glucose and blood alcohol concentrations are two pieces of information that are of paramount importance when an *apparently intoxicated* patient arrives at the [emergency room]." *Mitchell*, 139 S .Ct. at 2538 n.8 (emphasis added; second alteration in original; citation omitted). As previously indicated, *see supra* ¶10 n.3, at the hearing following remand, the circuit court found that Mitchell's blood would have been drawn by medical professionals even if police had not been seeking BAC information because Mitchell's condition "was so dire by the time he arrived at the hospital."

of the blood draw. The *Mitchell* Court provided clear guidance related to all OWI motorists who are unconscious or in such a stupor they cannot perform a breath test—taking such motorists to the hospital and performing a warrantless blood draw is reasonable and constitutional, and the related blood test will not be suppressed unless the motorist later shows both "that his blood would not have been drawn if police had not been seeking BAC information" and "that police could not have reasonably judged that a warrant application would interfere with other pressing needs or duties." *Id.* at 2539.

¶13    The *Mitchell* Court determined the facts of *this case* to be that when the officer located Mitchell, he was "[s]tumbling and slurring his words, [and] could hardly stand without the support of two officers." *Id.* at 2532. The officer "judged a field sobriety test hopeless, if not dangerous, and gave Mitchell a preliminary breath test" that indicated a BAC level of 0.24%—three times the legal limit. *Id.* The officer took Mitchell to the station to conduct a breathalyzer test. *Id.* On the way, Mitchell's condition "continued to deteriorate," and at the station "he was too lethargic even for a breath test. [The officer] therefore drove Mitchell to a nearby hospital for a blood test; Mitchell lost consciousness on the ride over and had to be wheeled in." *Id.* Considering this factual scenario, the Court stated: "Mitchell's stupor and eventual unconsciousness … deprived officials of a … reasonable opportunity to give Mitchell a breath test using 'evidence-grade breath testing machinery.' … [W]hen Mitchell's condition got in the way, *it was reasonable for [the officer] to pursue a blood test*." *Id.* at 2533-34 (emphasis added). Thus, the *Mitchell* Court determined that because Mitchell's extreme drunken condition at the police station made

him "too lethargic" to properly perform a breath test, *id.* at 2532, the officer's decision to take him to the hospital for a blood test "was reasonable,"[6] *id.* at 2534.

¶14 At the hearing upon remand, the officer testified that when he first made contact with Mitchell, he was "[v]ery lethargic," had been "swaying," and "nearly fell going from the street to the sidewalk." His condition deteriorated on the way to the police station and then continued to deteriorate while there. During the time when Mitchell "would normally be doing" the breath test at the station, the officer determined he would take Mitchell to the hospital for a blood draw because Mitchell "couldn't even stand" and "was physically unable to perform the breath test."[7] Mitchell "was very lethargic" to the point of being essentially "incapacitated."

¶15 On the way to the hospital, Mitchell's condition continued to decline as he "was beginning to sleep or go unconscious." When they arrived at the hospital, Mitchell "couldn't be woken … No stimulus worked to wake him," giving the officer concern for

---

[6] *See State v. Howes*, 2017 WI 18, ¶21, 373 Wis. 2d 468, 893 N.W.2d 812 ("The touchstone of the Fourth Amendment is reasonableness. As such, '[t]he Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable.' An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed objectively, justify [the] action.'" (citation omitted)).

[7] The officer explained that:

> [T]o do the breath test, you would need to stand up at the counter, and it wouldn't reach down to a chair…. It's a large unit[;] … [i]t's not something we can lift off the counter and bring to him. And there's specific instructions that we follow. So he would have to take a deep breath in and extend a significant amount of breath into the machine. And I didn't feel that he was physically able to do that.

Mitchell's medical condition.[8]  The officer needed assistance lifting Mitchell into a wheelchair, and medical staff began evaluating him after the officer wheeled him into the emergency room.  Staff assessed him with "[m]ultiple tests" and "[m]onitors," and they drew his blood for medical as well as evidentiary purposes.

¶16     When the *Mitchell* Court remanded this case, it did so for a very narrow purpose—to give Mitchell an opportunity to show that:  (1) his blood "would not have been drawn if police had not been seeking BAC information," and (2) the police "could not have reasonably judged that a warrant application would interfere with other pressing needs or duties."  *Mitchell*, 139 S. Ct. at 2539.  Because Mitchell has failed to make even the first showing, the officer's decision to "order a warrantless blood test to measure [Mitchell's] BAC [did not] offend[] the Fourth Amendment."  *Id.*  Thus, the warrantless blood draw was lawful.

*By the Court.*—Judgment and order affirmed.

---

[8]  The officer testified that during the eight minute drive from the station to the hospital, Mitchell's condition went from extreme drunken stupor to completely unconscious and unable to be roused.  The evidence provides no reason to believe that had Mitchell stayed at the station during those eight minutes that he would not have, at that location, lost consciousness and had to have been taken to the hospital then.  *See Mitchell*, 139 S. Ct. at 2537-38 ("[U]nconsciousness does not just create pressing needs; it is *itself* a medical emergency.  It means that the suspect *will have to be rushed to the hospital* … not just for the blood test but for urgent medical care." (second emphasis added)).